Needham HOLDER, Plaintiff–Appellant,

v.

CITY OF RALEIGH; Jack C. Duncan, Defendants–Appellees.

Needham HOLDER, Plaintiff–Appellee,

v.

CITY OF RALEIGH; Jack C. Duncan, Defendants–Appellants.

Nos. 88–3022(L), 88–3023.

United States Court of Appeals, Fourth Circuit.

Argued Nov. 2, 1988.

Decided Feb. 14, 1989.

Burton Craige (Tharrington, Smith & Hargrove, Donnell Van Noppen, III, Smith, Patterson, Follin, Curtis, James & Harka-vy, Raleigh, N.C., on brief), for plaintiff-appellant.

William E. Moore, Jr. (Guy F. Driver, Jr., Womble, Carlyle, Sandridge & Rice, Thomas A. McCormick, City Atty., Raleigh, N.C., on brief), for defendants-appellees.

Before ERVIN and WILKINSON, Circuit Judges, and KISER, United States District Judge for the Western District of Virginia at Danville, sitting by designation.

WILKINSON, Circuit Judge:

Needham Holder, a black employee of defendant City of Raleigh, alleges that the City's Parks and Recreation Department discriminated against him on the basis of race, in violation of 42 U.S.C. § 2000e, *et seq.*, and 42 U.S.C. §§ 1981 and 1983. The magistrate found that, while the City's promotion decision may have reflected "acts of nepotism," plaintiff suffered no discrimination because of his race. While a decisionmaker's preference for friends or relatives may be relevant evidence in a Title VII disparate treatment case, we cannot conclude as a matter of law that such preferences constitute discrimination on the basis of race. We thus affirm the judgment of the trial court.

## I.

In August of 1985, the City of Raleigh posted two job openings for the ground maintenance crew of the Parks and Recreation Department. The openings were for jobs as Equipment Operator I and Laborer I. Within a week of the posting, Holder applied for both jobs.

Holder and four other applicants met the minimal requirements for the positions. Three of the applicants, Scott Johnson, Mike O'Neal, and plaintiff, applied for both of the posted positions, while the other two, James Wilson and John Bailey, applied only for Equipment Operator I. All five applicants were scheduled for interviews. The interviewers were Roy Eason, supervisor of the heavy equipment crew; James Michael Bridges, Building and Maintenance Supervisor; and Charles William Cooke,

Assistant Superintendent of Parks. The three interviewers were white. In scoring the applicants, the panelists relied upon their subjective knowledge of the applicants, but not upon the applicants' personnel records or work histories.

During Holder's interview, Michael Bridges asked Holder several questions which were confrontational in tone. Holder was also asked to produce his driving record which showed no violations during the five years preceding September 1985. No white applicant was asked to produce his driving record. No evidence was presented as to whether Bailey, the other black applicant, was asked for his record. Bridges also told Holder during the interview that he thought his answers were untruthful. This comment apparently diverged from routine interview practice, which was to refrain from a discussion of the answers until after the interview was over.

The position of Equipment Operator I went to Scott Johnson, the highest scorer on the interview who was also the son of Don Johnson, a crew supervisor who reported directly to Michael Bridges. The position of Laborer I went to Mike O'Neal, the second highest scorer of the Laborer I applicants and the nephew of panelist Roy Eason. In September 1985, O'Neal was eighteen years old and had been employed by the City as a seasonal laborer for about three months.

At the time of the interview Holder had worked for the City longer than either Johnson or O'Neal. He had more experience operating the City's heavy equipment than either Johnson or O'Neal. Holder had, in fact, assisted in training Johnson. Holder also had completed seventy-seven hours of instruction at the Wilson Technical Institute on the front-end loader and the hydraulic backhoe. Scott Johnson had not then completed any course in equipment operation, and Mike O'Neal told the interview panel that he had completed only the front-end loader course.

Holder believed he had been the victim of racial discrimination. After exhausting both local and federal administrative reme-dies, he brought suit in federal court. The case was tried by consent before a magistrate. 28 U.S.C. § 636(c). At trial the magistrate found that Holder had presented a prima facie case of racial discrimination under Title VII. Defendants then advanced several reasons for the decision not to promote Holder. The first was his interview score, which reflected the panelists' concern that Holder was untrustworthy. Bridges believed that Holder had given false answers to five of the twelve questions asked. Defendants also claimed that Holder was not promoted because of a poor attendance record. According to the findings of the magistrate, however, when Holder had been verbally warned about his attendance in 1980, his record improved. Similarly, defendants claimed that Holder lacked initiative. The magistrate, however, found no evidence of this in later investigations by City officials. Finally, defendants claimed administrative inconvenience. Holder's lateral transfer would have required the City to post a new job opening and conduct new interviews for the Laborer I position on another crew that Holder presently held.

The magistrate held that the City had rebutted the plaintiff's prima facie case with two "clear and reasonably specific" reasons for their hiring decisions: interview scores and administrative convenience. The magistrate further found that although the reasons advanced by defendants may have been a pretext for "nepotism," Holder did not carry his ultimate burden of proving an intent to discriminate on the basis of race. This appeal followed.

## II.

Holder maintains that a finding that the City's promotion decision may have been influenced by nepotism mandates judgment in his favor on his Title VII disparate treatment claim. While we share his distaste for a decision which appears to have been made for reasons other than merit, we do not believe that Title VII authorizes courts to declare unlawful every arbitrary and unfair employment decision. To hold that favoritism toward friends and

relatives is *per se* violative of Title VII would be, in effect, to rewrite federal law. The list of impermissible considerations within the context of employment practice is both limited and specific: "race, color, religion, sex or national origin." We are not free to add our own considerations to the list. Here the magistrate found that there existed no illicit motive as defined by the statute. Unless we hold that finding clearly erroneous, our appellate inquiry is at an end.

What we say applies solely to disparate treatment claims. They constitute the most common anti-discrimination actions. Generally, they involve competing explanations for a particular employment decision. As the Supreme Court has noted:

> 'Disparate treatment' ... is the most easily understood type of discrimination. The employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin. Proof of discriminatory motive is critical, although it can in some cases be inferred from the mere fact of differences of treatment.

*International Brotherhood of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 1854 n. 15, 52 L.Ed.2d 396 (1977).

By contrast, disparate impact cases involve some facially neutral employment criterion which has an adverse impact upon a protected group. If the inquiry in a disparate treatment case focuses upon the existence of discriminatory intent, the inquiry in a disparate impact case is generally directed toward the business justification for the disputed employment test or practice. *See, e.g., Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975). The distinction between "disparate treatment" and "disparate impact" analysis under Title VII is not one of legal formalism. Rather it expresses the Supreme Court's view that individual decisions which are not impermissibly motivated may become actionable as a pattern of exclusion emerges, even without proof of actual wrongful intent. *Watson v. Fort Worth Bank and Trust*, —— U.S. ——, 108 S.Ct. 2777, 2785, 101 L.Ed.2d 827 (1988).

His protestations on appeal notwithstanding, Holder's is not a "disparate impact" case. At trial, plaintiff did not attempt to show that a general employment practice of nepotism had worked to the disadvantage of a pool of black applicants. The City of Raleigh, in fact, had a general management policy prohibiting nepotistic practices, although it was not applicable to this specific case. Counsel for plaintiff specifically agreed that this was not a disparate impact case. He further informed the trial court that "I think we could agree ... to exclude all statistical evidence because it at best has only marginal significance to this case." *See id.*, 108 S.Ct. at 2788–89 (identification of specific employment practice and statistical evidence of its effective exclusion of minority applicants necessary for Title VII disparate impact challenge to subjective promotions practices). Indeed, Holder has been unable to point to any incidents of nepotism other than those involved in his case. Thus, the question is one for conventional disparate treatment analysis. We must ask whether a proscribed motive was present in Holder's particular case.

The magistrate found that while defendants' proffered reasons were not a pretext for racial discrimination, they may have served "to hide acts of nepotism." We are aware, of course, that the word "nepotism" carries unsavory connotations. Nepotism is defined as "favoritism shown on the basis of family relationship, as in business or politics." *Random House Dictionary* 1289 (2d Ed.1987). Certainly there are similarities between nepotism and racial discrimination. Both select on a basis unrelated to merit. Both practices disqualify some applicants, *ab initio*, based on accidents of birth. In the absence of proof of discriminatory intent, however, "nepotism" by itself is not actionable under a disparate treatment analysis. A racially discriminatory motive cannot, as a matter of law, be invariably inferred from favoritism shown on the basis of some family relationship. A promotion decision motivated by favoritism toward relatives, however unfair, may

be qualitatively different from a decision motivated by racial animus. The former may value family relationships for reasons unrelated to race; the latter disadvantages job applicants precisely because of their race. There is also a difference between hiring on the basis of blind favoritism toward relatives and on the basis of knowledge and trust gained through some family relationship. We are not persuaded that a preference for family members is inevitably the flip side of racial animus for purposes of federal law.

Plaintiff emphasizes that the three interviewers and six of the seven supervisors in the Building and Maintenance section were white. We do not discount the relevance of such observations nor the fact that the action here arose in the context of a municipal workforce. Where the interviewers responsible for a particular promotion decision are white, a favoritism toward relatives would work to the detriment of black applicants. The effect of any such favoritism upon minorities—and the decision-maker's seeming indifference to that effect—is surely relevant to the question of discriminatory intent in a particular employment decision. A clannish preference for relatives may also be intertwined with racial stereotypes to such an extent that an intent to discriminate on the basis of race could be inferred. *Domingo v. New England Fish Co.*, 727 F.2d 1429, 1436 (9th Cir. 1984).

■ Although the presence of family preferences as a factor in a promotion might be part of the evidence upon which an inference of invidious motive may be drawn, intention to discriminate remains a question to be resolved by the ultimate trier of fact. In *Pullman–Standard v. Swint*, 456 U.S. 273, 102 S.Ct. 1781, 72 L.Ed.2d 66 (1982), plaintiffs challenged the validity, under § 703(h) of Title VII, of a seniority system maintained by the Pullman–Standard Company and the United Steelworkers of America. The Supreme Court stressed the heavily factual nature of the inquiry into discriminatory intent:

This is not to say that discriminatory impact is not part of the evidence to be considered by the trial court in reaching a finding on whether there was such a discriminatory intent as a factual matter. We do assert, however, that under § 703(h) discriminatory intent is a finding of fact to be made by the trial court; it is not a question of law and not a mixed question of law and fact of the kind that in some cases may allow an appellate court to review the facts to see if they satisfy some legal concept of discriminatory intent. Discriminatory intent here means actual motive; it is not a legal presumption to be drawn from a factual showing of something less than actual motive.

*Pullman–Standard*, 456 U.S. at 289–90, 102 S.Ct. at 1790–91 (footnote omitted).

The nature of that factual inquiry is rigorously defined by Title VII. The distinction between an unfair hiring decision and a hiring decision actionable under Title VII was made clear in *Autry v. North Carolina Department of Human Resources*, 820 F.2d 1384 (4th Cir.1987). There a black woman brought suit who failed to receive a promotion for which she met the minimum qualifications. The trial court found that a case of racial discrimination was not proven by showing that friendship or politics entered into the promotion decision. This court affirmed on the basis that it was plaintiff's burden to prove that "she was not promoted *because of* her race, not that she was a member of the black race *and* was not promoted." *Id.* at 1386. Similarly, it was Holder's burden to prove that he was not promoted because of his race—a burden the magistrate found explicitly had not been met.

Nor does the magistrate's finding that the defendants' proffered reasons may have been themselves pretextual prove plaintiff's case of racial discrimination. We agree with the Seventh Circuit that

[s]howing that the employer dissembled is not necessarily the same as showing 'pretext *for discrimination*' ... it may mean that the employer is trying to hide

some other offense, such as a violation of a civil service system or collective bargaining agreement.... It is easy to confuse 'pretext for discrimination' with 'pretext' in the more common sense (meaning any fabricated explanation for an action) ...

*Pollard v. Rea Magnet Wire Co., Inc.*, 824 F.2d 557, 559 (7th Cir.1987).

Similarly, a finding that the reasons proffered by defendants were, in some general sense, "unworthy of credence" does not of itself entitle plaintiff to prevail. *See id.* at 560. The reason for their lack of credence must be the underlying presence of proscribed discrimination. We have no authority simply to require employers to use the "best" standards and procedures available to them. *Furnco Construction Corp. v. Waters*, 438 U.S. 567, 578, 98 S.Ct. 2943, 2950, 57 L.Ed.2d 957 (1978) ("[c]ourts are generally less competent than employers to restructure business practices, and unless mandated to do so by Congress they should not attempt it"). Title VII is not a "bad acts" statute. *Benzies v. Illinois Dept. of Mental Health*, 810 F.2d 146, 148 (7th Cir. 1987). Without proof of racial discrimination, any remedy of ours would be without warrant in the law.

Our analysis with respect to Title VII also governs plaintiff's claims under 42 U.S.C. §§ 1981 and 1983. We have held that Title VII is not an exclusive remedy for employment discrimination by a public entity. *Keller v. Prince George's County*, 827 F.2d 952, 954 (4th Cir.1987). A state employee may still bring a Fourteenth Amendment challenge under 42 U.S.C. § 1983 to discriminatory employment decisions. This court has also held, however, that absent " 'impermissible sex or racial discriminations or First Amendment restraints—clear violations of positive express constitutional or statutory mandate— '[t]he federal court is not the appropriate forum in which to review the multitude of personnel decisions that are made daily by public agencies.' " *Clark v. Whiting*, 607 F.2d 634, 639 (4th Cir.1979) *quoting Bishop*

*v. Wood*, 426 U.S. 341, 349–50, 96 S.Ct. 2074, 2079–80, 48 L.Ed.2d 684 (1976). This holding reflects not only the view that the congressional mandate is a vigorous one within its sphere of operation, but also that there are state employment practices which lie beyond the bounds of federal law. The duty of the federal courts, whether under Title VII or 42 U.S.C. § 1983, is to redress racial, sexual, religious and national origin discrimination in employment. To expand that duty here would be to prove the maxim that hard cases make bad law.

## III.

Finally, we must ask whether the factual findings of the magistrate were clearly erroneous. *See United States Postal Service Bd. of Govs. v. Aikens*, 460 U.S. 711, 715, 103 S.Ct. 1478, 1481, 75 L.Ed.2d 403 (1983). We hold that they were not.

The magistrate's finding that family relationships may have been the motivating factor in the promotions decisions has a plausible ring; one is not "left with the definite and firm conviction that a mistake has been committed." *United States v. Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948).

Nor are we persuaded on other grounds that the fact-finder clearly erred in concluding that plaintiff had failed to prove the presence of racial discrimination. The interview scores of applicants were not clearly divided along racial lines. James Wilson, who is white, scored in the lower ranks with Holder. John Bailey, who is black, scored much higher, tying with Mike O'Neal. John Bailey also testified at trial that he did not feel that racial discrimination underlay the promotion decision.

Of course, the high interview score of the other black applicant would not have defeated plaintiff's claim if he had produced evidence of discriminatory intent toward himself. *Connecticut v. Teal*, 457 U.S. 440, 454–55, 102 S.Ct. 2525, 2534–35, 73 L.Ed.2d 130 (1982). But Holder never met this burden. Although the favoritism

shown toward relatives and close relatives of friends in this decision was arbitrary, the magistrate found it arbitrary in a universal sense. Anyone not related to a crew supervisor was disadvantaged.

Plaintiff points to certain subsidiary findings of fact in the magistrate's report to support his claim that the magistrate's ultimate finding of fact was clearly erroneous. Holder had more training and experience in heavy equipment operation and a higher grade operator's license than any other applicant. Holder also had a reputation as being a competent employee who did good work. In fact, it was these very findings that led the magistrate to find that Holder had established his prima facie case. However, these subsidiary findings do not lead ineluctably to an ultimate finding of racial discrimination, just as a prima facie case of discrimination is not sufficient to support a Title VII claim once legitimate reasons for an employer's decision have been produced. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981).

The magistrate in fact found that two of the reasons proffered by defendants, the interview scores and administrative convenience, were legitimate. He found that Holder's low interview score was caused, at least in part, by the panelists' concern that Holder was untrustworthy. The magistrate did not find that this lack of trust was based in racial animus. Whether the absence of trust on the part of the panelists was otherwise well grounded is not dispositive. "A reason honestly described but poorly founded is not a pretext, as that term is used in the law of discrimination." *Pollard*, 824 F.2d at 559. Bad or mistaken reasons for a decision may yet be non-discriminatory.

The magistrate also noted testimonial evidence that "black applicants had often been chosen for Equipment Operator I and Laborer I positions over white applicants" in the Parks Division and that at the time of the interviews plaintiff himself "had already been promoted to a Laborer I posi-

tion and he had once obtained the position of Equipment Operator I in 1980" during an earlier period of municipal employment. In short, the magistrate found the plaintiff "had failed to show that any acts of nepotism by the City have resulted in racial discrimination."

We feel constrained to uphold the magistrate in his ultimate finding of fact. "All courts have recognized that the question facing triers of fact in discrimination cases is both sensitive and difficult." *Aikens*, 460 U.S. at 716, 103 S.Ct. at 1482 (1983). The evidence presented in such cases will rarely be a seamless whole. It is true that the magistrate's findings, for all their length and care, were not in total harmony. If, however, we were to pick and choose subsidiary findings which did not flow smoothly into the ultimate conclusion as a basis for holding trial courts clearly erroneous, we would discourage the candid discussion of rough edges that will always characterize a difficult case.

We believe the Supreme Court's injunction in *Anderson v. Bessemer City*, 470 U.S. 564, 105 S.Ct. 1504, 84 L.Ed.2d 518 (1985), governs us here. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently." *Id.* at 573–4, 105 S.Ct. at 1511–12.

The judgment of the trial court is

AFFIRMED.