**Sharon C. FOSTER, Plaintiff, Appellant,**

v.

**John H. DALTON, Secretary of the Navy, Defendant, Appellee.**

No. 95–1522.

United States Court of Appeals, First Circuit.

Heard Nov. 9, 1995.

Decided Dec. 11, 1995.

Robert B. Mann, with whom Mann & Mitchell was on brief, Providence, RI, for appellant.

Jennifer H. Zacks, Attorney, U.S. Dep't of Justice, with whom Frank W. Hunger, Assistant Attorney General, Sheldon Whitehouse, United States Attorney, and Marleigh D. Dover, Attorney, U.S. Dep't of Justice, Washington, DC, were on brief, for appellee.

Before SELYA, CYR and STAHL, Circuit Judges.

SELYA, Circuit Judge.

Plaintiff-appellant Sharon C. Foster, an African–American woman, sued the Secretary of the Navy on the ground that the

Newport Naval Hospital (the Hospital) denied her a job due to her race.[1] Following a bench trial, the district court rendered judgment for the Secretary. Although the record makes it painfully clear that this episode is light years away from the Navy's finest hour, we have no principled choice but to affirm.

## I. BACKGROUND

The subsidiary facts are largely undisputed. The United States Navy maintains a substantial presence in Newport, Rhode Island. In the summer of 1989, the appellant found civilian employment at the Naval War College. Seeking to advance through the ranks, she assiduously applied for other, more attractive jobs in the Newport naval establishment. Since most facilities located at the base adhered to a policy of filling vacancies by selecting internal candidates (i.e., candidates already employed within the particular facility) where possible, the appellant had no luck until the Hospital hired her as its professional affairs coordinator. She reported for duty in July of 1990.

Shortly after the appellant came on board, the Hospital's director of administration, Commander William Travis, sought to fill a newly created opening for a management analyst. Because he believed that available funding would be jeopardized if the position remained open at the start of the next fiscal year (October 1, 1990), Commander Travis eschewed the hiring procedure ordinarily used to recruit civilian staff and undertook a non-competitive search. This process consisted mainly of culling the names of aspirants for advancement from existing files and assembling a list of potential candidates. Staff personnel compiled a roster of five such candidates (including the appellant). As among the five nominees, the appellant was twice distinguished: she was the only non-Caucasian and the only person already employed at the Hospital. Thus, had Commander Travis adhered to the usual policy of preferring in-house aspirants, the appellant—who was plainly qualified for the post—would have been selected.

When George Warch, the Hospital's civilian program specialist, presented Commander Travis with the list, Travis inquired why James Berry's name was omitted from it. Warch informed Travis that Berry—Warch's "fishing buddy" and Travis's acquaintance—could not be offered employment at the grade specified for the position. Travis promptly directed Warch to rewrite the job description, specify a lower grade (at which Berry would be eligible), and generate a new list. Leaving little to chance, Travis also decreed that candidates for the position should have certain computer expertise—expertise that Berry possessed—and intimated that he would invoke the Veterans Readjustment Act (VRA), 38 U.S.C. § 4214 (1988 & Supp. V 1993), in filling the management analyst vacancy.[2]

The modified job description yielded a fresh list with only one name on it: James Berry. Although Warch mused that the revisions made it appear that the powers-that-be had connived to preselect Berry for the vacancy, Travis brushed these concerns aside and named Berry to the management analyst position.

In the wake of Berry's hiring, the appellant filed an administrative complaint with the Navy, alleging that the Hospital had discriminated against her on the basis of her race and gender. Receiving no satisfaction, she brought suit in Rhode Island's federal district court, charging discrimination in contravention of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e (1988). Following a bench trial that focused on allegations of race discrimination,[3] the district court ruled

---

**1.** The Secretary is the appropriate defendant in this type of action. *See* 42 U.S.C. § 2000e–16(c) (1988).

**2.** Under the VRA, veterans receive preference in certain governmental employment. *See, e.g., Jakes v. Veterans Admin.,* 793 F.2d 293, 295 (Fed. Cir.1986) (elucidating VRA preference system); *see also Keyes v. Secretary of the Navy,* 853 F.2d 1016, 1020–21 (1st Cir.1988) (discussing veter-

ans' preferences generally); 5 C.F.R. § 307.102(a) (1995) ("Federal agencies have the responsibility to provide the maximum of employment and job advancement opportunities to eligible veterans...."). Not coincidentally, Berry had served in the United States Navy.

**3.** The appellant did not press her claim of gender discrimination at trial, and does not seek to

in the Secretary's favor. The court thought that the appellant proved a prima facie case, *see Foster v. Secretary of the Navy,* No. 93–0509, slip op. at 12 (D.R.I. Apr. 13, 1995), and also thought that she was better qualified for the position than Berry, *see id.* at 8. But the court determined that the Secretary had successfully rebutted the prima facie case by proffering a nondiscriminatory, if unsavory, reason for the personnel action: preselection of a friend of the appointing officer. *See id.* at 14. Overriding Travis's and Warch's pious assurances that cronyism played no role in Berry's recruitment, the court concluded that this was a near-classic case of an old boy network in operation, but not a situation in which the employment decision was motivated by racial animus.[4] This appeal ensued.

## II. ANALYSIS

■ The district court wrote a thoughtful, meticulously reasoned opinion dealing with many of the same contentions that Foster voices on appeal. Having carefully explored the nooks and crannies of the case, we affirm the judgment essentially on the basis of Judge Pettine's rescript. We embellish only in certain limited respects.

*First:* We start at a high level of generality. The appellant does not seriously dispute the district court's account of the facts, but vigorously attacks the inferences that the court saw fit to draw from them. Although she denies it, her jeremiad essentially asks that we reweigh the evidence de novo, and substitute a new set of inferences for the inferences drawn by the trier. Our standard of review, however, is much more circumscribed.

■ Following a bench trial, an appellate tribunal is not warranted in substituting its judgment for that of the trial court. This rule is composed of equal parts of common sense and practical wisdom: it is difficult to gain a full appreciation of a fact-sensitive controversy from a paper record, and the

district judge ordinarily has had the benefit of seeing and hearing the witnesses in person. Hence, we are not free to reject either his findings of fact or the conclusions he draws therefrom unless they are clearly erroneous, that is, "unless, on the whole of the record, we form a strong, unyielding belief that a mistake has been made." *Cumpiano v. Banco Santander P.R.,* 902 F.2d 148, 152 (1st Cir.1990). Findings concerning an employer's intent are subject to review under this standard, and can be set aside only for clear error. *See id.* (citing authorities).

■ This case is troubling in that we, if writing on a pristine page, might well have reached a different conclusion as to the impetus behind the refusal to hire. But that is not the test. *See Keyes v. Secretary of the Navy,* 853 F.2d 1016, 1027 (1st Cir.1988). While the record, read objectively, shows that the district court could have drawn an inference of discriminatory intent, it does not show that such an inference is compelled. That raises the stakes appreciably. It is common ground that, "when there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous." *Johnson v. Watts Regulator Co.,* 63 F.3d 1129, 1138 (1st Cir.1995) (citing *Anderson v. City of Bessemer City,* 470 U.S. 564, 574, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985)). So it is here.

*Second:* Turning to specifics, the appellant says that preselection (which, according to the court below, dictated the adverse employment decision) occurred only after the decisionmaker learned that the management analyst post would go to an African–American woman, virtually by default, if he failed to adopt an alternative means of candidate selection. This is a plausible rendition of the facts, but not the only permissible one. Though Berry's name first surfaced after Commander Travis received an initial list, Travis could well have expected all along to

resurrect it on appeal. The claim is therefore waived.

4. Though entering judgment in the Secretary's favor, the district court expressed its distaste for Commander Travis's ichthyophagous hiring practices. Among other things, the court chas-

tised Travis for his "ignorance of EEO hiring policies, his calloused attitude toward the hiring of minorities, and the fact that he rejected [Warch's] pre-selection concern...." *Foster,* slip op. at 14. The court's criticism appears to be well-founded.

see Berry in that lineup and, when his hopes were dashed, attempted to regain lost ground by altering the rules. Because both scenarios are plausible, we will not disturb the trial judge's choice between them. *See Johnson,* 63 F.3d at 1138; *Cumpiano,* 902 F.2d at 152; *Keyes,* 853 F.2d at 1019–20.

*Third:* The appellant insists that Commander Travis's abandonment of the Hospital's wonted policy of preferring in-house candidates itself gives rise to an irresistible inference of racial animus. The appellant weaves a complicated tapestry with the threads of this argument, hinting that the policy often operated in the past to exclude minority candidates from elevation, thus making the Hospital's disregard of it in a case where that policy would redound to the advantage of a minority candidate all the more cruel. In her view, this abrupt departure from past practice can only be explained on the basis of racial bias. We do not agree.

■ The district court treated this departure as suspicious, but concluded that Commander Travis tweaked the ordinary praxis to benefit a friend rather than to thwart a person of color. Two obvious propositions spring to mind. One is that cronyism is deplorable, especially when it is allowed to infect public sector employment decisions. The other obvious proposition is that Title VII does not have a limitless remedial reach. An employer can hire one person instead of another for any reason, fair or unfair, without transgressing Title VII, as long as the hiring decision is not spurred by race, gender, or some other protected characteristic. *See Keyes,* 853 F.2d at 1026. As we explain *infra,* Title VII does not outlaw cronyism— and, in this case, cronyism provides a sufficient alternative explanation for the challenged deviation from the standard hiring protocol. Thus, the district court's assessment of the proffered evidence was not clearly erroneous.

*Fourth:* At trial, Commander Travis stalwartly maintained that he hired Berry because he was the best qualified aspirant. Judge Pettine understandably discounted

this testimony. *See Foster,* slip op. at 14–15. Although the appellant concedes that a court is not legally bound to find for a Title VII plaintiff simply because it rejects the employer's proffered reason for an employment decision, she maintains that, here, the court's disbelief of the explanation, coupled with the deviation from the standard policy of in-house preferment, compels an inference that the decision was race-driven. To shore up this contention, the appellant points to the naval officials' repeated denials of favoritism. Noting that the district court declined to credit these denials because they were self-serving, *see id.* at 14, the appellant asseverates that, since preselection was the only alternative rationale that could sidetrack a finding of racial discrimination, the district court erred; the denials of preselection were, in fact, against self-interest, and the employer should be held to them.

■ This argument is too clever by half. We do not believe it is implausible that veteran bureaucrats—and, in our view, "bureaucrat" and "naval officer" are not mutually exclusive terms—would deny preselection to avoid the stigma of having failed to follow neutral hiring procedures. Indeed, Travis's and Warch's on-the-stand denials are replete with clues from which the district judge reasonably could have deduced that the two men collogued to tilt the process in Berry's favor.[5] In all events, actions speak louder than words. In a bench trial "what an actor says is not conclusive on a state-of-mind issue. Notwithstanding a person's disclaimers, a contrary state of mind may be inferred from what he does and from a factual mosaic tending to show that he really meant to accomplish that which he professes not to have intended." *Anthony v. Sundlun,* 952 F.2d 603, 606 (1st Cir.1991).

In one sense, the district court's finding that an old boy network was in operation though the old boys denied it amounts to a credibility call. By and large, such calls are for the district court, not for the court of appeals. *See, e.g., id.* (warning that the court

---

5. To cite one example, Warch admitted that he proposed invoking the VRA as a means to getting Berry's name to the forefront.

of appeals "ought not to disturb supportable findings, based on witness credibility, made by a trial judge who has seen and heard the witnesses at first hand"). There is no reason to apply a different rule in this case.

*Fifth:* The appellant argues passionately that even if Commander Travis fished Berry from the applicant pool simply because he was spawned by the old boy network, such a hiring decision itself contravenes the mandate of Title VII. Though this construct, which rests on the premise that cronyism is the primary means by which employers perpetuate workplace apartheid, possesses a certain superficial appeal, it cannot withstand close perscrutation.

Indeed, the construct lacks any vestige of precedential support. The very cases on which the appellant relies explicitly reject it. *See, e.g., Holder v. City of Raleigh,* 867 F.2d 823, 825–26 (4th Cir.1989) (rebuffing plaintiff's assertion that nepotistic hiring practices, even when denied by· defendant under racially charged circumstances, constitute impermissible discrimination under Title VII); *Autry v. North Carolina Dep't of Human Resources,* 820 F.2d 1384, 1385 (4th Cir.1987) (similar). Thus, her argument amounts to nothing more than a plea that we impose the construct by judicial fiat. But that is not our province. Given the state of the law, appellant's construct should be debated before the Congress, not argued before the courts.

Relatedly, the appellant suggests that Title VII must be read to bar cronyism because that tawdry practice assures continued white domination in the workplace. But this suggestion challenges as discriminatory a facially race-neutral (if offensive) policy, and necessarily depends for support on an examination of multiple hiring decisions. It is, therefore, better tailored to cases alleging disparate impact as opposed to disparate treatment. *See Autry,* 820 F.2d at 1385; *see generally Furnco Constr. Corp. v. Waters,* 438 U.S. 567, 575, 579–80, 98 S.Ct. 2943, 2948–49, 2950–52, 57 L.Ed.2d 957 (1878) (explaining the basic dichotomy between dispa-

rate impact and disparate treatment); *cf. EEOC v. Steamship Clerks Union, Local 1066,* 48 F.3d 594, 606 (1st Cir.) (holding in disparate impact case that a policy of nepotism can, under certain circumstances, constitute evidence of race discrimination in employment), *cert. denied,* —— U.S. ——, 116 S.Ct. 65, 133 L.Ed.2d 27 (1995).

Where, as here, a disappointed applicant has made no systematic effort to prove *pervasive* cronyism or to show that cronyism, when practiced in a particular workplace, regularly yields a racially discriminatory result, a disparate impact claim goes by the boards. So here: at trial, appellant's counsel, responding to the district court's insightful questioning, characterized the suit as one involving disparate treatment, not disparate impact. That characterization binds the appellant in the present venue as well.

This brings us full circle. While the facts of this disparate treatment case can support an inference of discriminatory intent, they can equally support a finding of undiluted favoritism, unmixed with racial animus. On such a record, it is the trial court's prerogative—indeed, its duty—to select the inference that it deems appropriate. Because we cannot accept the appellant's invitation to create a presumption that the use of an old boy network in hiring constitutes per se racial discrimination, we are powerless to subvert the district court's election between conflicting inferences.

## III. CONCLUSION

■ We need go no further.[6] Title VII "does not presume to obliterate all manner of inequity, or to stanch, once and for all, what a Scottish poet two centuries ago termed '[m]an's inhumanity to man.'" *Keyes,* 853 F.2d at 1026 (quoting Robert Burns, *Man Was Made to Mourn* (1786)). Like the court below, we find the conduct of the naval hierarchy in this case to be deserving of opprobrium, but two wrongs seldom make a right. Discerning no clear error in the district court's finding that favoritism, not racism,

---

**6.** This appeal concerns only Foster's claims under Title VII. We take no view of what remedies, if any, federal law or regulations governing personnel practices may afford the appellant to redress this seeming injustice.

tainted Commander Travis's decisionmaking, we reject Foster's appeal.

***Affirmed.   No costs.***