# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 05-2799

_____

| | | |
|---|---|---|
| Larry Harris, doing business as Harris Construction Management Company, | * * * * | |
| | * | |
| Appellant, | * * | |
| | * | |
| v. | * * | |
| | * | |
| Mayor Patrick Henry Hays, Mayor of the City of North Little Rock, Arkansas; Martin Gipson; Greg Yielding; Gary Berry; Charlie Hight; and Murry Witcher, Individually and in their official capacities as City Council Members of the City of North Little Rock, Arkansas; and the City Council of the City of North Little Rock, Arkansas, | * * * * * * * * * * * * * | Appeal from the United States District Court for the Eastern District of Arkansas. |
| Appellees. | * | |

_____

Submitted: March 16, 2006
Filed: July 5, 2006

_____

Before COLLOTON, JOHN R. GIBSON and GRUENDER, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Larry Harris appeals the order of the district court[1] granting summary judgment to the City Council of North Little Rock and the city's mayor and five city council members in their official and individual capacities (collectively, "the defendants") on Harris's claims of discrimination and deprivation of a property right under 42 U.S.C. §§ 1981 and 1983. For the reasons discussed below, we affirm the judgment of the district court.

I.   BACKGROUND

The City of North Little Rock, Arkansas ("City") implemented the "Year 2000 Sidewalk Program" to bring city sidewalks into compliance with the Americans with Disabilities Act. The City opened Phase I of the project for bids, expressly stating in the bid package that the City reserved the right to add or subtract sidewalks from the contract as funds allowed. Harris, an African-American, submitted the lowest bid of $558,300 and was awarded the Phase I contract. The City subsequently removed some sidewalks from the package, and Harris signed the Phase I contract for $330,000.

Some of the sidewalks removed from the Phase I contract later were included in the Phase II contract. The lowest bid of $335,444 for the Phase II contract was submitted by Tom Brooks, a Caucasian. Harris's bid of $479,459 was only the sixth-lowest bid. The City awarded Phase II to Brooks. Again, the City removed sidewalks from the package, and in 2001 Brooks signed the Phase II contract for $179,000.

---

[1]The Honorable William R. Wilson, Jr., United States District Judge for the Eastern District of Arkansas.

Brooks had never performed work for the City before, but he was well-acquainted with City Engineer Mike Smith and had done work on Smith's residence. Brooks also was acquainted with at least two of the City council members. During performance of the Phase II contract, Brooks offered to keep his price-per-square-foot constant at the 2001 level if the City agreed to extend his contract for successive phases without re-bidding. Smith informed the City Council that the price of new bids likely would rise each year and that, in his opinion, Brooks's offer was financially advisable. The City Council passed an ordinance extending the contract with Brooks without new bids.

Arkansas law required a municipality to award contracts exceeding $10,000 through competitive bidding, except "in exceptional situations where [competitive bidding] is deemed not feasible or practical" by the city government. Ark. Code Ann. § 14-58-303(b)(2) (2001). The City generally provided for waiver of competitive bidding only in "emergency" situations involving imminent danger of damage. No evidence of an emergency was advanced to justify the award of the extended sidewalk contract to Brooks without competitive bidding.

When the Year 2000 Sidewalk Program finally was opened again to competitive bidding in 2004, Brooks and seven other contractors submitted bids. Harris did not bid. The contract was awarded to an African-American contractor who was the lowest bidder.

Harris brought a claim against the defendants under 42 U.S.C. § 1981 for racial discrimination in the awarding of the Phase II contract and a claim under 42 U.S.C. § 1983 for deprivation of a property right under color of state law in violation of due process. The defendants moved for summary judgment on the ground that the

challenged contract decisions were made for financial reasons.[2]  The district court granted the summary judgment motion, holding that Harris failed to create a reasonable inference that the contract decision was based on racial discrimination and that Harris had no property right in the extended portion of the Phase II contract. Harris appeals.

## II.    DISCUSSION

"We review a grant of summary judgment de novo, viewing the facts in the light most favorable to the non-moving party."  *Cottrill v. MFA, Inc.*, 443 F.3d 629, 635 (8th Cir. 2006).

### A.    The § 1981 Claim

Section 1981 protects citizens' rights to make and enforce contracts.  The *McDonnell Douglas* burden-shifting framework applies to motions for summary judgment in cases arising under § 1981 where there is no direct evidence of discrimination.[3]  *Roxas v. Presentation College*, 90 F.3d 310, 315 (8th Cir. 1996). Under this framework, the claimant first must establish a prima facie case of discrimination; if a prima facie case is established, the burden of production shifts to the defendant to show a legitimate, nondiscriminatory reason for the challenged action; and if the defendant proffers such a reason, the burden of production shifts back to the claimant to establish that the proffered reason is a mere pretext for discriminatory animus.  *Id*. at 315-16.  "A plaintiff establishes a prima facie case

---

[2]The defendants also asserted that they were protected by qualified and legislative immunity in passing the city ordinance extending Brooks's contract without bidding.  The district court did not address this defense, and it is not necessary for this Court to reach its merits on appeal.

[3]Harris concedes that there is no direct evidence of discrimination.

under § 1981 by showing (1) membership in a protected class; (2) the intent to discriminate on the basis of race on the part of the defendant; and (3) discrimination interfering with a protected activity (i.e., the making and enforcement of contracts)." *Daniels v. Dillard's, Inc.*, 373 F.3d 885, 887 (8th Cir. 2004). One way for the claimant to establish the second element, the defendant's intent to discriminate, is to show that he was treated differently from similarly situated nonmembers of the protected class. *Turner v. Gonzales*, 421 F.3d 688, 694 (8th Cir. 2005).

Harris did not establish his prima facie case because he did not present evidence sufficient to create an inference that the defendants intended to discriminate against him on the basis of race.[4] Harris argues that he was treated differently from Brooks in several respects and that Brooks, a Caucasian, was a similarly situated nonmember of the protected class. However, each of Harris's allegations of disparate treatment fails.

First, Harris notes that the value of his Phase I contract was reduced from $558,300 to $330,000 and that some of the removed work was shifted to the Phase II contract awarded to Brooks. However, the bid solicitation expressly reserved the right to add or remove work based on available funding, and in fact Brooks's Phase II contract also was reduced from $335,444 to $179,000. Therefore, Harris was not treated differently from Brooks.

---

[4]Harris claims that the district court erred in its application of the *McDonnell Douglas* framework because the district court relied on a nondiscriminatory justification for the defendants' actions, "cronyism," which was not advanced by the defendants as a legitimate, nondiscriminatory reason for the challenged action. However, the district court actually held that Harris failed to establish an element of his prima facie case because the evidence created no inference that the defendants intended to discriminate against Harris on the basis of race, but rather only an inference that the defendants intended to favor Brooks due to cronyism.

Second, Harris cites as evidence of discriminatory intent the City's decision to extend additional work under Brooks's Phase II contract without competitive bidding after the City refused Harris's request to extend his Phase I contract without competitive bidding. Again, Brooks was not similarly situated to Harris because Brooks offered to keep his price-per-square-foot constant at the 2001 level for three years if the City agreed to the extension, while Harris did not make a similar pricing offer in his request for extra work.

Third, Harris notes that at some point during Brooks's contract, Brooks was allowed to ignore the contract specification to use Nycon, an expensive concrete additive. Harris contends that he could have submitted a lower Phase II bid if he had been told that the Nycon requirement would not be enforced. There is no disparate treatment in this instance because Brooks and the other four contractors who submitted lower Phase II bids than Harris had to account for the cost of Nycon when they bid the contract, just as Harris did. Absent evidence that at the time of bidding the City informed Brooks, but not the African-American bidders, that the Nycon requirement would be dropped at some point, this later change does not create an inference of discrimination against Harris in the awarding of the contract.

Fourth, Harris argues that the City inspected Brooks's work less rigorously than it inspected Harris's work during Phase I. The deposition testimony on which Harris relies suggests that, at most, City Engineer Smith was very informal when working with Brooks because of their social relationship. Again, this evidence does not create an inference of racial discrimination in the awarding of the contract.[5]

---

[5]We agree with the concurring opinion's statement, *post* at 10, that "evidence that the defendants here had a non-racial reason for treating Brooks and Harris differently should [not] mean that Harris failed to make a prima facie case." Instead, we find that Harris failed to make a prima facie case with regard to inspections because the record evidence cited by Harris does not, in fact, suggest that Harris's work was inspected differently from Brooks's work. Harris himself summarizes the

Because Harris did not present sufficient evidence to create an inference of an intent to discriminate on the basis of race on the part of the defendants, Harris cannot establish a prima facie case for his § 1981 claim. Therefore, the grant of summary judgment to the defendants on that claim is appropriate.

## B. The § 1983 Claim

Harris claims that the extension of Brooks's Phase II contract in contravention of Ark. Code Ann. § 14-58-303(b)(2) violated Harris's due process property right in the extended portion of the contract. "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Board of Regents of State Colleges v. Roth*, 408 U.S. 564, 577 (1972). Arkansas statutes create a property interest in a competitively bid public contract for the lowest bidder that complied with the bidding specifications and procedures. *L & H Sanitation, Inc. v. Lake City Sanitation, Inc.*, 769 F.2d 517, 524 (8th Cir. 1985).

We need not decide whether a similar protected property right arises in a public contract that should have been, but was not, open to competitive bidding. Assuming *arguendo* that such a property right would be recognized, Harris at a minimum would have to show that he would have been the lowest bidder on the extended portion of the contract, and thus would have had "a legitimate claim of entitlement to it," had it been opened to bidding. Although Harris was the lowest bidder on the Phase I contract in

allegedly disparate treatment with regard to inspections by stating that City Engineer Smith and Brooks "visited together, enjoyed lunch, or ate pretzels from the jar Mr. Smith kept on his desk" in addition to reviewing Brooks's work. Appellant's Brief at 17. Notwithstanding Harris's assertions to the contrary, none of the evidence cited by Harris suggests that the actual inspection of Brooks's work was different from the inspection of Harris's work.

2000, he was only the sixth-lowest bidder on the Phase II contract in 2001. This falls far short of establishing any claim that Harris would have been the lowest bidder for 2002 or 2003. In the absence of evidence that Harris would have had a property interest in the extended portion of the contract, Harris's § 1983 claim fails.

## III.    CONCLUSION

We conclude that the district court did not err in granting summary judgment to the defendants on Harris's § 1981 and § 1983 claims. Therefore, we affirm the judgment of the district court.

JOHN R. GIBSON, Circuit Judge, concurring.

I concur in the result because I am concerned that the Court's opinion could be read to mean that Harris failed to make a prima facie case even though he showed different treatment of Brooks and himself. The district court relied on "cronyism," a reason other than the one asserted by the employer, to justify the alleged preference for Brooks over Harris:

> The evidence produced by Plaintiff raises an inference that in this particular instance there was favoritism shown to Mr. Brooks, a Caucasian[,] to the detriment of Plaintiff, an African-American.
> . . .
> I want to make it clear that in finding for defendants in this case, I do not discount that in some instances, a clannish preference for friends and relatives may also be intertwined with racial preferences and stereotypes that amount to an invidious intent to discriminate on the basis of race. However, in this case, the Plaintiff has failed to produce sufficient evidence to create a reasonable inference establishing his prima facie case. . . . At worst, the evidence simply tends to create an inference that Mr. Brooks was awarded the extended contract, not because of financial concerns, but because of "cronyism."

-8-

Dist. Ct. slip op. at 8-9.  The defendants had contended that the reason Brooks got the extended contract was financial advantage to the city; thus, the district court in effect held that the defendants had used a pretext, but that it was not a pretext for racial discrimination.  Our Court today remarks on this reasoning, *supra* at 5 n.4, but does not rely on it, except in excusing the alleged laxity of Smith's inspection of Brooks's work, *supra* at 6.  I write separately to underscore the problems with the idea that evidence of "cronyism" rules out "discrimination."

The district court's conclusion that the evidence created an inference that cronyism influenced the award of the extended contract is troublesome to me.  My starting point is the meaning of the word "cronyism," and for this I turn to *Webster's Third International Dictionary*.  "Crony" is defined as "an intimate companion esp. of long standing: a familiar friend: an old chum."  "Cronyism" is " partiality to cronies esp. as evidenced in the appointing of political hangers-on to office without due regard being taken of their qualifications."

Our Court remarks that the district court held that "Harris failed to establish an element of his prima facie case because the evidence created no inference that the defendants intended to discriminate against Harris on the basis of race, but rather only an inference that the defendants intended to favor Brooks due to cronyism." *Supra* at 5 n.4.  Where a discrimination plaintiff has shown that he has been treated differently from others who were outside the protected class, I believe that the plaintiff should not be said to have failed to make a prima facie case because there is an explanation for the differential treatment.  The original test for a prima facie case as stated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973), called for proof

> (i) that [the plaintiff] belongs to a racial minority; (ii) that he applied and
> was qualified for a job for which the employer was seeking applicants;
> (iii) that, despite his qualifications, he was rejected; and (iv) that, after
> his

rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications.

*McDonnell Douglas* itself recognized that the formulation would not fit the facts of every case and would have to be adjusted. *Id.* at 802 n.13. Accordingly, we modified the test where the plaintiff could not show that his position remained open, but could show that he was treated differently from persons who were not members of his protected class; in such a case, we substituted a different fourth element, that the "plaintiff show that his or her discharge occurred under circumstances that create an inference of unlawful discrimination." *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1308 (8th Cir. 1994). But even with this less specific formulation, the essence of the prima facie test was still unequal treatment of minorities versus non-minorities. *See id.* The use of the "circumstances that create an inference of unlawful discrimination" formulation was not meant to force the plaintiff to prove the ultimate issue of discrimination in order to make a prima facie case. *Id.* The prima facie case was still meant to be a first step, not the finish line. *See id.* (burden of making prima facie case is "not onerous") (quoting *Texas Dep't of Com'ty Affairs v. Burdine*, 450 U.S. 248, 253-54 (1981)); *Rodgers v. U.S. Bank, N.A.*, 417 F.3d 845, 852 (8th Cir. 2005).

The question of whether there is a legitimate, nondiscriminatory reason for the different treatment is to be dealt with at the second step of the *McDonnell Douglas* analysis, not the first. *See McDonnell Douglas*, 411 U.S. at 802. Thus, I cannot agree that the evidence that the defendants here had a non-racial reason for treating Brooks and Harris differently should mean that Harris failed to make a prima facie case.

Moreover, I do not believe that characterization of the reason for the unequal treatment as cronyism should always mean that the plaintiff failed to carry his burden of proof on the ultimate issue of discrimination. Although there are certainly cases saying that nepotism, cronyism, and personal favoritism are not equivalent to racial

discrimination,[6] it is nevertheless an oversimplification to conclude that "cronyism" is always a legitimate, nondiscriminatory reason for a hiring decision--especially by a governmental employer.[7] This is because "there are similarities between nepotism and racial discrimination. Both select on a basis unrelated to merit. Both practices disqualify some applicants, ab initio, based on accidents of birth." *Holder v. City of Raleigh*, 867 F.2d 823, 826 (4th Cir. 1989). Indeed, racism can be said to be a particular kind of cronyism or favoritism. While we must require that a racial discrimination case has a racial aspect, we must also take care not to condone a defense that would immunize racial discrimination by giving it a different name.

It is well established that cronyism can form the basis of a disparate impact claim where the plaintiff is able to show a pattern of favoritism that closes a protected class out of jobs or contracts. *See Foster v. Dalton*, 71 F.3d 52, 57 (1st Cir. 1995). But this is a disparate treatment case, not a disparate impact case, since Harris does not contend he has shown a pattern of cronyism affecting others than himself. He must therefore prove the element of discriminatory intent. However, even in a disparate treatment case, the same evidence that proves cronyism is often ambiguous and amenable to interpretation as evidence of racial discrimination. The employer could prefer X over Y because X is his friend, but he might choose to hire a friend of his own race in order to avoid hiring a person of a different race. In such cases, a trier of fact could either accept the employer's non-racial cronyism explanation or find that

---

[6]*Neal v. Roche*, 349 F.3d 1246, 1251-52 (10th Cir. 2003); *Foster v. Dalton*, 71 F.3d 52, 56 (1st Cir. 1995); *Howard v. BP Oil Co.*, 32 F.3d 520, 527 (11th Cir. 1994); *Holder v. City of Raleigh*, 867 F.2d 823, 826-27 (4th Cir. 1989). *But see Domingo v. New England Fish Co.*, 727 F.2d 1429, 1436 (9th Cir. 1984) (nepotism in hiring, plus use of subjective hiring criteria, plus use of racial labels for certain jobs supported allegations of intentional discrimination).

[7]*See Backlund v. Hessen*, 104 F.3d 1031, 1033-34 (8th Cir. 1997), holding that a hiring decision by a governmental employer based on nepotism can be arbitrary, thus violating the equal protection clause of the Fourteenth Amendment.

the explanation was a mask for racial preference. For this reason, in *Foster*, the First Circuit held that an administrator's decision to hire a white, male fishing buddy instead of a more qualified African-American woman created an issue of fact as to whether the reason was racism or "undiluted favoritism, unmixed with racial animus." 71 F.3d at 57.

> On such a record, it is the trial court's prerogative–indeed, its duty– to select the inference that it deems appropriate. Because we cannot accept the appellant's invitation to create a presumption that the use of an old boy network in hiring constitutes per se racial discrimination, we are powerless to subvert the district court's election [in a bench trial] between conflicting inferences.

*Id.* ; *accord Holder*, 867 F.2d at 827 ("Although the presence of family preferences as a factor in a promotion might be part of the evidence upon which an inference of invidious motive may be drawn, intention to discriminate remains a question to be resolved by the ultimate trier of fact.").

There are similar cases in which judgment as a matter of law was entered for the employer, but they have significant differences. Although the Tenth Circuit affirmed summary judgment in a case where the employer had chosen a white employee over a black one to protect the white woman from being laid off, the plaintiff had conceded the avoidance of lay-off was determinative, and so had conceded away racism. *Neal v. Roche*, 349 F.3d 1246 (10th Cir. 2003). Here, of course, there is no such concession. In *Brandt v. Shop 'N Save Warehouse Foods, Inc.*, 108 F.3d 935 (8th Cir. 1997), our court entered judgment as a matter of law for an employer who passed over a female candidate to hire an unemployed male friend of a vice president of the company. The employer's proffered reason was that the female candidate was "unqualified," a reason that this court found was a "fabrication," made to hide the truth that the job was especially designed for the vice president's

friend.  108 F.3d at 938.  *Brandt* was arguably a "pretext plus" case,[8] decided during the period of uncertainty preceding *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000), which of course governs our decision.  Under *Reeves* the prima facie case, combined with the jury's rejection of the employer's asserted reason, can suffice to allow a jury to find discrimination.  *Id.* at 147-48.  Even if *Brandt* had had the benefit of *Reeves*, it would be distinguishable from our case because of a factual difference that has been considered significant elsewhere– the candidate who got the job was unemployed, thus giving the employer a compelling non-discriminatory reason for hiring him.  108 F.3d at 938; *see Neal*, 349 F.3d at 1252 (summary judgment where plaintiff conceded "employer had a specific, nondiscriminatory motivation, to rescue the successful candidate from looming unemployment").

Factual nuances specific to the case will usually give the jury a context for deciding whether favoritism is purely personal or has a racial aspect.  The question of whether the favoritism had a racial aspect must be evaluated on the myriad peculiar facts of the case, such as the closeness of the relationship between employer and successful candidate (brother-in-law or cocktail-party acquaintance?), the relative qualifications of the candidates, the employer's workplace environment, etc.  Only in a rare case will the evidence of cronyism be unambiguously non-discriminatory.  I believe that a case in which the evidence could support either an inference of non-racial cronyism or preference with a racial aspect should be sent to the trier of fact to choose among competing inferences.

Although the district court relied on the cronyism explanation, the Court today for the most part is able to justify the summary judgment by different reasoning and relies on the cronyism explanation only to excuse the alleged laxity of inspections by Smith of Brooks' work.  I have reviewed the record citations on which Harris relies

---

[3]"[I]t is not enough that the employee submit evidence of pretext such that the jury disbelieves the defendant's 'legitimate' reasons."  *Brandt*, 108 F.3d at 938.

to show this laxity, and I am not convinced that these citations show that Smith treated Brooks differently from Harris so as to establish a prima facie case on this ground. Accordingly, I concur in the result reached by the Court, though not in all of its reasoning.

———————————————————