UNITED STATES COURT OF APPEALS UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT FOR THE FIRST CIRCUIT



No. 95-1522

SHARON C. FOSTER,

Plaintiff, Appellant,

v.

JOHN H. DALTON, SECRETARY OF THE NAVY,

Defendant, Appellee.



APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

[Hon. Raymond J. Pettine, Senior U.S. District Judge] 


Before

Selya, Cyr and Stahl, Circuit Judges. 



Robert B. Mann, with whom Mann & Mitchell was on brief, for 
appellant.
Jennifer H. Zacks, Attorney, U.S. Dep't of Justice, with 
whom Frank W. Hunger, Assistant Attorney General, Sheldon 
Whitehouse, United States Attorney, and Marleigh D. Dover, 
Attorney, U.S. Dep't of Justice, were on brief, for appellee.



December 11, 1995



SELYA, Circuit Judge. Plaintiff-appellant Sharon C. SELYA, Circuit Judge. 

Foster, an African-American woman, sued the Secretary of the Navy

on the ground that the Newport Naval Hospital (the Hospital)

denied her a job due to her race.1 Following a bench trial, the

district court rendered judgment for the Secretary. Although the

record makes it painfully clear that this episode is light years

away from the Navy's finest hour, we have no principled choice

but to affirm.

I. BACKGROUND I. BACKGROUND

The subsidiary facts are largely undisputed. The

United States Navy maintains a substantial presence in Newport,

Rhode Island. In the summer of 1989, the appellant found

civilian employment at the Naval War College. Seeking to advance

through the ranks, she assiduously applied for other, more

attractive jobs in the Newport naval establishment. Since most

facilities located at the base adhered to a policy of filling

vacancies by selecting internal candidates (i.e., candidates

already employed within the particular facility) where possible,

the appellant had no luck until the Hospital hired her as its

professional affairs coordinator. She reported for duty in July

of 1990.

Shortly after the appellant came on board, the

Hospital's director of administration, Commander William Travis,

sought to fill a newly created opening for a management analyst.

 

1The Secretary is the appropriate defendant in this type of
action. See 42 U.S.C. 2000e-16(c) (1988). 

2

Because he believed that available funding would be jeopardized

if the position remained open at the start of the next fiscal

year (October 1, 1990), Commander Travis eschewed the hiring

procedure ordinarily used to recruit civilian staff and undertook

a non-competitive search. This process consisted mainly of

culling the names of aspirants for advancement from existing

files and assembling a list of potential candidates. Staff

personnel compiled a roster of five such candidates (including

the appellant). As among the five nominees, the appellant was

twice distinguished: she was the only non-Caucasian and the only

person already employed at the Hospital. Thus, had Commander

Travis adhered to the usual policy of preferring in-house

aspirants, the appellant who was plainly qualified for the post

would have been selected.

When George Warch, the Hospital's civilian program

specialist, presented Commander Travis with the list, Travis

inquired why James Berry's name was omitted from it. Warch

informed Travis that Berry Warch's "fishing buddy" and Travis's

acquaintance could not be offered employment at the grade

specified for the position. Travis promptly directed Warch to

rewrite the job description, specify a lower grade (at which

Berry would be eligible), and generate a new list. Leaving

little to chance, Travis also decreed that candidates for the

position should have certain computer expertise expertise that

Berry possessed and intimated that he would invoke the Veterans

Readjustment Act (VRA), 38 U.S.C. 4214 (1988 & Supp. V 1993),

3

in filling the management analyst vacancy.2

The modified job description yielded a fresh list with

only one name on it: James Berry. Although Warch mused that the

revisions made it appear that the powers-that-be had connived to

preselect Berry for the vacancy, Travis brushed these concerns

aside and named Berry to the management analyst position.

In the wake of Berry's hiring, the appellant filed an

administrative complaint with the Navy, alleging that the

Hospital had discriminated against her on the basis of her race

and gender. Receiving no satisfaction, she brought suit in Rhode

Island's federal district court, charging discrimination in

contravention of Title VII of the Civil Rights Act of 1964, 42

U.S.C. 2000e (1988). Following a bench trial that focused on

allegations of race discrimination,3 the district court ruled in

the Secretary's favor. The court thought that the appellant

proved a prima facie case, see Foster v. Secretary of the Navy, 

No. 93-0509, slip op. at 12 (D.R.I. Apr. 13, 1995), and also

thought that she was better qualified for the position than

Berry, see id. at 8. But the court determined that the Secretary 
 

2Under the VRA, veterans receive preference in certain
governmental employment. See, e.g., Jakes v. Veterans Admin., 
793 F.2d 293, 295 (Fed. Cir. 1986) (elucidating VRA preference
system); see also Keyes v. Secretary of the Navy, 853 F.2d 1016, 
1020-21 (1st Cir. 1988) (discussing veterans' preferences
generally); 5 C.F.R. 307.102(a) (1995) ("Federal agencies have
the responsibility to provide the maximum of employment and job
advancement opportunities to eligible veterans . . . ."). Not
coincidentally, Berry had served in the United States Navy. 

3The appellant did not press her claim of gender
discrimination at trial, and does not seek to resurrect it on
appeal. The claim is therefore waived.

4

had successfully rebutted the prima facie case by proffering a

nondiscriminatory, if unsavory, reason for the personnel action:

preselection of a friend of the appointing officer. See id. at 

14. Overriding Travis's and Warch's pious assurances that

cronyism played no role in Berry's recruitment, the court

concluded that this was a near-classic case of an old boy network

in operation, but not a situation in which the employment

decision was motivated by racial animus.4 This appeal ensued.

II. ANALYSIS II. ANALYSIS

The district court wrote a thoughtful, meticulously

reasoned opinion dealing with many of the same contentions that

Foster voices on appeal. Having carefully explored the nooks and

crannies of the case, we affirm the judgment essentially on the

basis of Judge Pettine's rescript. We embellish only in certain

limited respects.

First: We start at a high level of generality. The First: 

appellant does not seriously dispute the district court's account

of the facts, but vigorously attacks the inferences that the

court saw fit to draw from them. Although she denies it, her

jeremiad essentially asks that we reweigh the evidence de novo,

and substitute a new set of inferences for the inferences drawn

 

4Though entering judgment in the Secretary's favor, the
district court expressed its distaste for Commander Travis's
ichthyophagous hiring practices. Among other things, the court
chastised Travis for his "ignorance of EEO hiring policies, his
calloused attitude toward the hiring of minorities, and the fact
that he rejected [Warch's] pre-selection concern . . . ."
Foster, slip op. at 14. The court's criticism appears to be 
well-founded.

5

by the trier. Our standard of review, however, is much more

circumscribed.

Following a bench trial, an appellate tribunal is not

warranted in substituting its judgment for that of the trial

court. This rule is composed of equal parts of common sense and

practical wisdom: it is difficult to gain a full appreciation of

a fact-sensitive controversy from a paper record, and the

district judge ordinarily has had the benefit of seeing and

hearing the witnesses in person. Hence, we are not free to

reject either his findings of fact or the conclusions he draws

therefrom unless they are clearly erroneous, that is, "unless, on

the whole of the record, we form a strong, unyielding belief that

a mistake has been made." Cumpiano v. Banco Santander P.R., 902 

F.2d 148, 152 (1st Cir. 1990). Findings concerning an employer's

intent are subject to review under this standard, and can be set

aside only for clear error. See id. (citing authorities). 

This case is troubling in that we, if writing on a

pristine page, might well have reached a different conclusion as

to the impetus behind the refusal to hire. But that is not the

test. See Keyes v. Secretary of the Navy, 853 F.2d 1016, 1027 

(1st Cir. 1988). While the record, read objectively, shows that

the district court could have drawn an inference of

discriminatory intent, it does not show that such an inference is

compelled. That raises the stakes appreciably. It is common

ground that, "when there are two permissible views of the

evidence, the factfinder's choice between them cannot be clearly

6

erroneous." Johnson v. Watts Regulator Co., 63 F.3d 1129, 1138 

(1st Cir. 1995) (citing Anderson v. City of Bessemer City, 470 

U.S. 564, 574 (1985)). So it is here.

Second: Turning to specifics, the appellant says that Second: 

preselection (which, according to the court below, dictated the

adverse employment decision) occurred only after the

decisionmaker learned that the management analyst post would go

to an African-American woman, virtually by default, if he failed

to adopt an alternative means of candidate selection. This is a

plausible rendition of the facts, but not the only permissible

one. Though Berry's name first surfaced after Commander Travis

received an initial list, Travis could well have expected all

along to see Berry in that lineup and, when his hopes were

dashed, attempted to regain lost ground by altering the rules.

Because both scenarios are plausible, we will not disturb the

trial judge's choice between them. See Johnson, 63 F.3d at 1138; 

Cumpiano, 902 F.2d at 152; Keyes, 853 F.2d at 1019-20. 

Third: The appellant insists that Commander Travis's Third: 

abandonment of the Hospital's wonted policy of preferring in-

house candidates itself gives rise to an irresistible inference

of racial animus. The appellant weaves a complicated tapestry

with the threads of this argument, hinting that the policy often

operated in the past to exclude minority candidates from

elevation, thus making the Hospital's disregard of it in a case

where that policy would redound to the advantage of a minority

candidate all the more cruel. In her view, this abrupt departure

7

from past practice can only be explained on the basis of racial

bias. We do not agree.

The district court treated this departure as

suspicious, but concluded that Commander Travis tweaked the

ordinary praxis to benefit a friend rather than to thwart a

person of color. Two obvious propositions spring to mind. One

is that cronyism is deplorable, especially when it is allowed to

infect public sector employment decisions. The other obvious

proposition is that Title VII does not have a limitless remedial

reach. An employer can hire one person instead of another for

any reason, fair or unfair, without transgressing Title VII, as

long as the hiring decision is not spurred by race, gender, or

some other protected characteristic. See Keyes, 853 F.2d at 

1026. As we explain infra, Title VII does not outlaw cronyism  

and, in this case, cronyism provides a sufficient alternative

explanation for the challenged deviation from the standard hiring

protocol. Thus, the district court's assessment of the proffered

evidence was not clearly erroneous.

Fourth: At trial, Commander Travis stalwartly Fourth: 

maintained that he hired Berry because he was the best qualified

aspirant. Judge Pettine understandably discounted this

testimony. See Foster, slip op. at 14-15. Although the 

appellant concedes that a court is not legally bound to find for

a Title VII plaintiff simply because it rejects the employer's

proffered reason for an employment decision, she maintains that,

here, the court's disbelief of the explanation, coupled with the

8

deviation from the standard policy of in-house preferment,

compels an inference that the decision was race-driven. To shore

up this contention, the appellant points to the naval officials'

repeated denials of favoritism. Noting that the district court

declined to credit these denials because they were self-serving,

see id. at 14, the appellant asseverates that, since preselection 

was the only alternative rationale that could sidetrack a finding

of racial discrimination, the district court erred; the denials

of preselection were, in fact, against self-interest, and the

employer should be held to them.

This argument is too clever by half. We do not believe

it is implausible that veteran bureaucrats and, in our view,

"bureaucrat" and "naval officer" are not mutually exclusive terms

would deny preselection to avoid the stigma of having failed to

follow neutral hiring procedures. Indeed, Travis's and Warch's

on-the-stand denials are replete with clues from which the

district judge reasonably could have deduced that the two men

collogued to tilt the process in Berry's favor.5 In all events,

actions speak louder than words. In a bench trial "what an actor

says is not conclusive on a state-of-mind issue. Notwithstanding

a person's disclaimers, a contrary state of mind may be inferred

from what he does and from a factual mosaic tending to show that

he really meant to accomplish that which he professes not to have

intended." Anthony v. Sundlun, 952 F.2d 603, 606 (1st Cir. 
 

5To cite one example, Warch admitted that he proposed
invoking the VRA as a means to getting Berry's name to the
forefront.

9

1991).

In one sense, the district court's finding that an old

boy network was in operation though the old boys denied it

amounts to a credibility call. By and large, such calls are for

the district court, not for the court of appeals. See, e.g., id. 

(warning that the court of appeals "ought not to disturb

supportable findings, based on witness credibility, made by a

trial judge who has seen and heard the witnesses at first hand").

There is no reason to apply a different rule in this case.

Fifth: The appellant argues passionately that even if Fifth: 

Commander Travis fished Berry from the applicant pool simply

because he was spawned by the old boy network, such a hiring

decision itself contravenes the mandate of Title VII. Though

this construct, which rests on the premise that cronyism is the

primary means by which employers perpetuate workplace apartheid,

possesses a certain superficial appeal, it cannot withstand close

perscrutation.

Indeed, the construct lacks any vestige of precedential

support. The very cases on which the appellant relies explicitly

reject it. See, e.g., Holder v. City of Raleigh, 867 F.2d 823, 

825-26 (4th Cir. 1989) (rebuffing plaintiff's assertion that

nepotistic hiring practices, even when denied by defendant under

racially charged circumstances, constitute impermissible

discrimination under Title VII); Autry v. North Carolina Dep't of 

Human Resources, 820 F.2d 1384, 1385 (4th Cir. 1987) (similar). 

Thus, her argument amounts to nothing more than a plea that we

10

impose the construct by judicial fiat. But that is not our

province. Given the state of the law, appellant's construct

should be debated before the Congress, not argued before the

courts.

Relatedly, the appellant suggests that Title VII must

be read to bar cronyism because that tawdry practice assures

continued white domination in the workplace. But this suggestion

challenges as discriminatory a facially race-neutral (if

offensive) policy, and necessarily depends for support on an

examination of multiple hiring decisions. It is, therefore,

better tailored to cases alleging disparate impact as opposed to

disparate treatment. See Autry, 820 F.2d at 1385; see generally 

Furnco Constr. Corp. v. Waters, 438 U.S. 567, 575, 579-80 (1987) 

(explaining the basic dichotomy between disparate impact and

disparate treatment); cf. EEOC v. Steamship Clerks Union, Local 

1066, 48 F.3d 594, 606 (1st Cir.) (holding in disparate impact 

case that a policy of nepotism can, under certain circumstances,

constitute evidence of race discrimination in employment), cert. 

denied, 116 S. Ct. 65 (1995). 

Where, as here, a disappointed applicant has made no

systematic effort to prove pervasive cronyism or to show that 

cronyism, when practiced in a particular workplace, regularly

yields a racially discriminatory result, a disparate impact claim

goes by the boards. So here: at trial, appellant's counsel,

responding to the district court's insightful questioning,

characterized the suit as one involving disparate treatment, not

11

disparate impact. That characterization binds the appellant in

the present venue as well.

This brings us full circle. While the facts of this

disparate treatment case can support an inference of

discriminatory intent, they can equally support a finding of

undiluted favoritism, unmixed with racial animus. On such a

record, it is the trial court's prerogative indeed, its duty 

to select the inference that it deems appropriate. Because we

cannot accept the appellant's invitation to create a presumption

that the use of an old boy network in hiring constitutes per se

racial discrimination, we are powerless to subvert the district

court's election between conflicting inferences.

III. CONCLUSION III. CONCLUSION

We need go no further.6 Title VII "does not presume

to obliterate all manner of inequity, or to stanch, once and for

all, what a Scottish poet two centuries ago termed `[m]an's

inhumanity to man.'" Keyes, 853 F.2d at 1026 (quoting Robert 

Burns, Man Was Made to Mourn (1786)). Like the court below, we 

find the conduct of the naval hierarchy in this case to be

deserving of opprobrium, but two wrongs seldom make a right.

Discerning no clear error in the district court's finding that

favoritism, not racism, tainted Commander Travis's

decisionmaking, we reject Foster's appeal.

 

6This appeal concerns only Foster's claims under Title VII.
We take no view of what remedies, if any, federal law or
regulations governing personnel practices may afford the
appellant to redress this seeming injustice.

12

Affirmed. No costs. Affirmed. No costs. 

13