**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

IVAN A. RODRIGUEZ,
Plaintiff-Appellant,

v.

No. 97-1668

MICHAEL KANTOR, SECRETARY OF
COMMERCE OF THE UNITED STATES OF
AMERICA,
Defendant-Appellee.

Appeal from the United States District Court
for the District of Maryland, at Greenbelt.
Catherine C. Blake, District Judge.
(CA-95-710-CCB)

Argued: June 5, 1998

Decided: August 20, 1998

Before HAMILTON and MOTZ, Circuit Judges, and
WILLIAMS, Senior United States District Judge
for the Eastern District of Virginia,
sitting by designation.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Michael Gerard Kane, CASHDAN & GOLDEN, Wash-
ington, D.C., for Appellant. Perry F. Sekus, Assistant United States
Attorney, Baltimore, Maryland, for Appellee. **ON BRIEF:** Vicki G.

Golden, David R. Cashdan, CASHDAN & GOLDEN, Washington, D.C., for Appellant. Lynne A. Battaglia, United States Attorney, Baltimore, Maryland, for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

Introduction

This matter is before the Court on appeal of the district court's granting of summary judgment in favor of defendant on Counts I, II, and III of the Complaint.

Statement of the Issues

1. Whether the district court properly entered summary judgment on the defendant-appellee's behalf on plaintiff-appellant's claim under the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq., ("Title VII"), where Rodriguez failed to show that he was subjected to disparate treatment because of his national origin.

2. Whether the district court correctly determined that Rodriguez was not unlawfully terminated because the evidence showed that he threatened the life of his supervisor.

3. Whether the district court properly granted summary judgment in favor of the defendant on plaintiff's retaliation claim where there was no evidence from which a jury could reasonably find that the defendant's legitimate business reason for terminating Rodriguez was pretextual.

2

Procedural History

Rodriguez filed an EEO complaint with the NIST Office on June 1, 1994. He alleged that he was discriminated against on the basis of his national origin during his brief period of employment at NIST. He also alleged that NIST retaliated against him after he purportedly complained that his second-line supervisor, Patricia Lynch, had discriminated against him.

On March 4, 1994, prior to filing his complaint, Rodriguez met with an EEO counselor. On August 8, 1994, the agency assigned his complaint for investigation. On November 28, 1994, EEOC Administrative Judge Veronica Burgess King notified Rodriguez that a hearing on his EEO complaint would be held on April 6, 1995. On March 2, 1995 Rodriguez notified the Administrative Judge that he intended to file a civil complaint in U.S. District Court for the District of Maryland and that accordingly, an administrative hearing would not be necessary. Consequently, on March 7, 1995, the Administrative Judge dismissed Rodriguez' case.

On March 10, 1995 Rodriguez filed his complaint in district court alleging two counts of national origin discrimination and one count of retaliation. In a Memorandum and Order dated April 21, 1997 Judge Catherine Blake granted the Secretary's motion for summary judgment.

Facts: The Hiring Stage

In December of 1992, NIST posted a vacancy announcement for several custodial positions. Rodriguez applied for one of these positions. In February 1993 Patricia Lynch, who served as the Group Leader for Janitorial Services at NIST, contacted Rodriguez for an interview. At that time there were no persons of Hispanic origin on NIST's custodial staff. According to her affidavit testimony, Lynch was "pleased" that Rodriguez applied for a custodial position because "we wanted to obtain as diverse a work force as possible." Based on the interview between Rodriguez and Lynch, Lynch contacted Kathy DelBalzo, a Personnel Management Specialist in NIST's Office of Personnel, to recommend that Rodriguez be selected for the position. DelBalzo notified Rodriguez by telephone that he had been tenta-

tively selected for employment at NIST, pending passage of a medical exam and a performance test.

Shortly after recommending Rodriguez for employment, Lynch received a negative reference from Rodriguez' former employer. The reference stated that Rodriguez had been "terminated" and that he was not eligible for rehire. In light of this information and an additional negative reference from another former employer of Rodriguez, Lynch recommended to Ellen Dowd, NIST's Personnel Officer, that Rodriguez' offer of employment should be rescinded. Before sending the memo to Dowd, Lynch provided a copy to Walter Rabbitt, the Chief of Facilities Services, for his review and signature. Rabbitt opted not to sign the memorandum.

On May 17, 1993 Rabbitt drafted a memo to Lynch, advising her to acquire more information about Rodriguez' previous employment. Lynch followed this advice and informed Rabbitt that she still believed Rodriguez' offer of employment should be rescinded. Rabbitt did not follow Lynch's advice, but concluded instead that the agency should go forward with its plans to hire Rodriguez. On September 9, 1993 DelBalzo sent another letter to Rodriguez informing him he had been tentatively selected for the job. After he passed his physical and practical examinations, the agency extended to Rodriguez a formal offer of employment and he began work on December 13, 1993.

Rabbitt temporarily assigned Rodriguez to the mail room because, according to Lynch, Lynch wanted to conduct a joint orientation session with Rodriguez and two other employees who were due to join the work force at NIST within a few weeks. Rodriguez contends that he was placed in the mail room as a result of Lynch's racially hostile attitude towards him.

During Rodriguez' brief tenure at NIST, Mr. Lyles and Ellen Schildtknect served as his first-line supervisors. Lynch, however, who was Rodriguez' second-line supervisor, and who was known throughout the division as a "hands-on" supervisor, routinely dealt directly with Rodriguez, just as she dealt directly with the other custodians in the Janitorial Services Group.

4

The facts show that Rodriguez began his employment at NIST by performing high-quality work. In fact, during his first few weeks on the job, Lynch stated that she was "impressed" with Rodriguez. One custodial worker asserts that Lynch "bragged" about him, telling other workers how well he was doing his job.

The facts also show, however, that the quality of Rodriguez' work eventually began to disintegrate; he failed to follow proper procedures and often performed tasks too quickly for the result to be acceptable. Other workers began complaining about Rodriguez'"shoddy" work. In addition, several of Rodriguez' co-workers did not like to work with him because he acted like a "know it all" who liked to do things his way only.

Rodriguez alleges that from the outset Lynch exhibited racially hostile behavior towards himself and other non-white employees. Rodriguez alleges that Lynch blatantly favored white employees over minority employees and gave the opinions of Rodriguez' white super- visors more credence than the opinions his African-American supervi- sors. Rodriguez alleges that Lynch made his life miserable by continually yelling at him, finding fault in his work, giving him unre- alistic assignments and isolating him from his colleagues. Rodriguez' African-American supervisors (Wilson and Lyles) testified that they came to believe that Lynch's treatment of Rodriguez was an attempt to compel Rodriguez to resign.

Rodriguez alleges that Lynch singled him out and picked on him because she did not like Hispanics. He complained that Lynch never exchanged pleasantries with him, that Lynch spoke to him as if he were a child, and that Lynch frequently yelled at him for little or no reason. Rodriguez states that he was treated differently from other non-Hispanic employees. As set forth in his EEOC Complaint, Rodri- guez alleged that some other examples of this different treatment include: (1) Ms. Lynch never acknowledged him or communicated with him except to assign work or reprimand; (2) Rodriguez was assigned to the mail room initially on a temporary basis;
(3) Rodriguez felt isolated and separated from the other workers;
(4) Rodriguez was accused falsely of not locking up the recycling storage area; and (5) Rodriguez was assigned to pull trash alone in

5

a building that was a lot of work to be completed in one day by one person.

The record in this case shows that as the relationship between Rodriguez and Lynch disintegrated, and as the quality of Rodriguez' work diminished, the frequency and severity of Lynch's admonitions increased, and Rodriguez began complaining to his co-workers about Lynch. He objected to the way Lynch "was treating all of us" and complained that the entire custodial staff was "scared" of Lynch. Rabbitt explained that the probable source of the staff's apprehension of Lynch was that "she expects a day's work for a day's wages, and she did not hesitate to tell you if you weren't up to snuff." However, the record also suggests that at times Lynch tended to be overbearing on her employees, and aspired to exact over them a level of control that was ultimately unattainable.

Lynch maintained a file on all of her employees, including Rodriguez. When an issue arose about any employee, Lynch would make note of that issue in that employee's file. In a note dated January 5, 1994, Lynch documented an occasion which gave rise to another employee's (Ms. Shanholtz) refusal to work with Rodriguez because of his purported stubbornness and hostility towards other people's methods. Lynch's file also reflects that on that same day, Rodriguez' supervisor reported his work as "unsatisfactory." Later in the same month, Mr. Lyles, Rodriguez' supervisor, who was African-American, wrote a note for the file complaining of Rodriguez' work performance. Other notes in the file confirmed that Rodriguez repeatedly failed to perform his assigned tasks and refused to follow instructions.

Additional evidence in the record of Rodriguez' performance as an employee at NIST reflects his intransigence and failure to follow instructions. Evidence before the district court showed that Rodriguez balked at wearing the regulation uniform supplied by NIST, stating that he did not like the pants that he was required to wear. On another occasion, Rodriguez failed to attend a mandatory monthly safety meeting for all employees.

Rodriguez' shortcomings as an employee developed to the point where he was unable to perform his required tasks within an eight-

6

hour work day. Thus, Rodriguez began reporting to work early. Lynch advised Rodriguez that for insurance liability reasons, he was not permitted to begin work before his scheduled shift. However, in an effort to address this problem, Lynch instructed Rodriguez to report his work progress to his supervisor by telephone as he passed from one floor of a building to another so that his progress could be monitored. This was a normal procedure adopted by NIST to conduct time studies of its employees. Rodriguez resented "being timed" in this manner and often refused to call in as he was instructed. On one occasion Rodriguez was asked why he did not call in and he stated: "Hey, I'm not here to keep track of time. I got a job to do."

On or about February 17, 1994 Rodriguez told Rabbitt that he was afraid of losing his job because it appeared that Lynch was harassing him because he was the only Hispanic on the staff. Rabbitt's stated that he would look into the matter and get back to him. Rabbitt asserts that he took notes during this meeting with Rodriguez, but threw the notes away sometime after Rodriguez was fired. At some later time Rabbitt told Lynch that Rodriguez had been in to speak to him.

On or about February 23, 1994 Rodriguez complained in a memorandum to Rabbitt that he was having difficulties at his job and that he and his co-workers were "under distress" because of Lynch. At about the same time, Rabbitt was advised by Lynch and Krista Shanholtz that Rodriguez was overheard threatening to harm Lynch. Rabbitt called for an immediate investigation and assigned James Aycock (security specialist) to lead it. Aycock discovered from the corroborating statements of other employees that Rodriguez had threatened to run down Lynch with his car and "blow her . . . head off." Rodriguez also allegedly said "this could be another mail room massacre." Shanholtz believed that Rodriguez was serious about carrying out the threats. Rodriguez also threatened to cut Dwight Hoffman's throat because Hoffman had reported Rodriguez for leaving the recycling bin open. Finally, another employee heard Rodriguez say that Lynch "could be walking through the parking lot and a car could hit her."

On March 4, 1994, Aycock met with Rodriguez to discuss these threats. Rodriguez declined to complete an affidavit denying the allegations made against him. On March 7, 1994 Rabbitt terminated Rodriguez for having made statements to his co-workers threatening

7

harm to his supervisor, Lynch. Appellee argues that Rabbitt's decision was made with the concurrence of the personnel office and the Deputy Director of Administration, Karl Bell.

The district court granted summary judgment on the Secretary's behalf on Rodriguez' disparate treatment claim. The court held that in order to survive summary judgment, Rodriguez was required to come forward with sufficient evidence from which a jury could reasonably find that the Secretary discriminated against Rodriguez in the terms, conditions, or privileges of his employment based on his national origin. The district court determined that the acts about which Rodriguez complained did not qualify as adverse employment actions under Title VII.

The district court concluded that Rodriguez failed to come forward with any evidence to establish that the Secretary's legitimate nondiscriminatory reason for firing Rodriguez was pretextual. The district court also concluded that Rodriguez could not sustain a retaliation claim because there was no evidence to show that the Secretary's legitimate business reason for terminating Rodriguez was pretextual.

Count One

The Court reviews the grant or denial of summary judgment as a matter of law de novo. Mitchell v. Data General Corporation, 12 F.3d 1310, 1313 (4th Cir. 1993); Becerra v. Dalton , 94 F.3d 145, 148 (4th Cir. 1996), cert. denied, 117 S. Ct. 1087 (1997).

Count I of the complaint alleges that the Secretary discriminated against Rodriguez in the terms and conditions of his employment on the basis of his national origin. Specifically, Rodriguez complained about (1) his initial temporary assignment to the mail room; (2) Lynch's alleged failure to return his greetings; (3) his assignment to pull trash alone in building 101; (4) his being required to call in his location from every floor; (5) his being accused of not locking the recycling storage area; and (6) generally, the manner in which Lynch allegedly treated him in comparison to other, non-Hispanic employees. Rodriguez contends that several of these issues of material fact remain in dispute, to an extent that a trier of fact could find for the nonmoving party.

8

The Fourth Circuit has made it clear that Title VII is concerned with the question "of whether there has been discrimination in what could be characterized as ultimate employment decisions such as hiring, granting leave, discharging, promoting, and compensating." Page v. Bolger, 645 F.2d 227, 233 (4th Cir. 1981), cert. denied, 454 U.S. 92 (1982). Title VII prohibits discrimination that affects the "terms, conditions, or privileges of employment." It does not regulate all activities in the workplace; instead, it regulates only adverse employment decisions. Page, 645 F.2d at 233; Ennis v. National Assoc. of Bus. and Educational Radio, Inc., 53 F.3d 55, 57-58 (4th Cir. 1995).

This Court noted in Page that "there are many interlocutory or mediate decisions having no immediate effect upon employment conditions which were not intended to fall within the distinct prescriptions of 42 U.S.C. § 2000e-16 and comparable provisions of Title VII." Page, 645 F.2d at 233. The district court clearly relied upon this tenet by ruling that the conduct about which Rodriguez complained did not amount to adverse employment actions. Rodriguez does not argue on appeal that any one of Lynch's allegedly discriminatory practices in Count I rises to the level of being an "adverse employment action." Rather, Rodriguez argues, for the first time in this case, that the actions taken against him created a hostile working environment in violation of Title VII.

It is well established that absent plain error, exceptional circumstances, or a fundamental miscarriage of justice, the Court should not address issues raised for the first time on appeal. Singer v. Dungan, 45 F.3d 823, 827-28 (4th Cir. 1995); United States v. One 1971 Mercedes Benz, 542 912, 915 (4th Cir. 1976). It is also well established that a plaintiff may not bring a discrimination suit to redress matters about which he failed to make an administrative complaint. Brown v. General Services Admin., 425 U.S. 820, 822-33 (1976); Zografov v. Veterans Admin. Medical Center, 779 F.2d 967, 968-69 (4th Cir. 1985). However, the Court assumes that while Rodriguez' hostile work environment claim is belated, it can be read into the ambit of Rodriguez' broad disparate-treatment claim, and the Court will therefore address it.

In order to succeed on a hostile work environment claim, Rodriguez must show first that the workplace at NIST was permeated with

9

discriminatory intimidation, ridicule and insult. To meet his burden of proof, Rodriguez must establish that the conduct about which he complained was severe or pervasive enough to alter the conditions of his employment and create an abusive working environment. Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 998, 1001 (1998); Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993); Meritor Savings Bank v. Vinson, 477 U.S. 57, 65 (1986); Carter v. Ball, 33 F.3d 450, 461 (4th Cir. 1994).

If Rodriguez can prove that Lynch created a hostile working environment for him, the Court must then visit the question of vicarious liability. The Supreme Court has held recently that"an employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." Burlington Industries, Inc. v. Ellerth, ___ U.S. ___, 1998 WL 336326 (U.S.) (1998); Faragher v. Boca Raton, ___ U.S. ___, 1998 WL 336322 (U.S.) (1998). The Supreme Court held further that when no tangible employment action is taken, a defending employer may raise a two-part affirmative defense to liability or damages, subject to proof by a preponderance of the evidence under Fed. R. Civ. P. 8(c). The employer must prove (1) that the employer exercised reasonable care to prevent and correct promptly any harassing behavior; and (2) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise. Ellerth, supra, ___ U.S. at ___, 1998 WL 336326 (U.S.) at 15. No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment. Id.

Rodriguez has alleged that Lynch unfairly yelled at him, unfairly criticized his work, and encouraged others to criticize him and exclude him. Rodriguez argues that the "totality of the circumstances" from both an objective and subjective point of view reveals that a hostile work environment did exist. Under controlling case law, the four factors that must be evaluated to assess whether the totality of the circumstances violated Title VII are (1) the frequency of the discriminatory conduct; (2) its severity; (3) whether it is physically threatening or humiliating, or a mere offensive utterance; and (4) whether it

10

unreasonably interferes with an employee's work performance. Beardsley v. Webb, 30 F.3d 524, 529 (4th Cir. 1994).

Rodriguez argues under (2) that the harassment was severe and pervasive. The district court concluded as a matter of law that it was not and this Court finds no argument supporting a departure from this reasoning. Rodriguez argues under (3) that Lynch's treatment of him demeaned and threatened him, and weakened his confidence in his job security. It is clear from the record that Rodriguez was not happy at work during the weeks preceding his termination, but it has not been established that Rodriguez' unhappiness resulted solely from a racially hostile work environment. Finally, under (4) Rodriguez asserts that Lynch's constant criticism, conflicting instructions and frequent shouting and screaming caused him to perform his work poorly, especially when Lynch assigned him to tasks that were too big for just one janitor. The record shows Rodriguez did indeed raise the ire of his supervisor, Lynch, but there no evidence which suggests that Lynch was any less disagreeable or demanding to any other, similarly-behaving employee in an identical manner.

While Rodriguez apparently believed that he was singled out by Lynch because she purportedly did not like Hispanics, it is not enough to sustain his hostile work environment claim. Instead, this Court has held that what is relevant to this inquiry is not what Rodriguez "understood" his employer's motivations to be, but instead, what the employer's motivations actually were. See, e.g., Evans v. Technologies Applications & Services, Co., 875 F.Supp. 1115, 1124 (D. Md. 1995) (Williams, J.), aff'd, 80 F.3d 954 (4th Cir. 1996) ("only [the employer's] perceptions about [the employee's] qualifications are relevant."). See also Williams v. Cerberonics , 871 F.2d 452, 455 (4th Cir. 1989) (a "plaintiff's own assertions of discrimination in and of themselves are insufficient to counter substantial evidence of legitimate nondiscriminatory reasons for an adverse employment action.") (citing Gairola v. Commonwealth of Virginia Dept. Of General Svcs., 753, F.2d 1281, 1288 (4th Cir. 1985)).

Simply stated, Rodriguez' hostile work environment claim fails to survive when it is grounded in the allegations contained in his complaint. Lynch was a hands-on manager who was often demanding and perhaps overbearing to her employees. The record shows that Lynch

11

and Rodriguez did not get along very well on a personal level. The record also shows that Lynch's overbearing tendencies coupled with Rodriguez' indolence as an employee only made the relationship less desirable. For instance, it is clear that Rodriguez often ignored Lynch's instructions, and refused to perform his work in a satisfactory manner. Because of this type of behavior, Lynch reprimanded Rodriguez on several occasions.

Even while it is apparent that Lynch and Rodriguez did not share an amicable relationship, the record is barren of evidence which would suggest that Lynch did not or would not reprimand or otherwise discipline other workers who also failed to perform their tasks properly. In fact, Rodriguez himself conceded that several members of the janitorial staff complained at some time about Lynch's demeanor.

Because Rodriguez fails to make a valid hostile work environment claim this Court does not reach the question of employer liability as it is set forth by the Supreme Court in Burlington Industries, Inc. v. Ellerth and Faragher v. City of Boca Raton , supra.

For these reasons the Court affirms the ruling of the district court as to Count I.

Count Two

In Count II of his complaint, Rodriguez alleged that his "involuntary removal from his position as a Custodial Worker constitute[d] national origin discrimination in violation of Title VII, 42 U.S.C. § 2000e-2(a)(1)." The district court concluded that Rodriguez failed to produce any persuasive evidence from which a jury could reasonably find that the defendant's legitimate business-related explanation for terminating Rodriguez was pretextual. We agree with the district court.

Under McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), and its progeny Rodriguez must establish a prima facie case of discrimination. Specifically, he must show that (1)  he is a member of a protected class; (2) he was discharged; (3) at the time of the dis-

12

charge, he was performing at a satisfactory level, meeting his employer's legitimate expectations; and (4) following his discharge, he was replaced by a person outside the protected class or his employer treated similarly-situated employees outside his class more favorably. See Lenoir v. Roll Coater, Inc., 13 F.3d 1130, 1132 (7th Cir. 1994); EEOC v. Western Electric Co., Inc., 713 F.2d 1011, 1014 (4th Cir. 1983).

The burden then shifts to the Department of Commerce to articulate some legitimate, nondiscriminatory reason for the employee's rejection. If the defendant discharges its burden of production, the plaintiff must be afforded a fair opportunity to show that the reason articulated by the defendant is pretextual.

The defendant asserts that Rodriguez was terminated because he threatened harm to his supervisor, Lynch. Rodriguez advances three arguments in an attempt to show that this reason was pretextual. The Court finds each of appellant's arguments defective.

First, Rodriguez asserts that the Agency did not discipline Lynch for allegedly making the remark that "she would arrange to have someone shoot Mr. Rodriguez." Rodriguez has failed to introduce any evidence which would suggest that Rabbitt was aware that Lynch purportedly made this remark, and thus, Rodriguez cannot show that Rabbitt intentionally declined to discipline Lynch for the same conduct that Rodriguez engaged in.

Second, Rodriguez argues that Rabbitt's conclusion that Rodriguez had made a threat cannot withstand the analysis required under federal personnel law. Specifically, Rodriguez asserts that the threatening statements which were attributed to him do not rise to the level of "threats" as contemplated under Metz v. Department of Treasury, 780 F.2d 1001, 1002 (Fed. Cir. 1986). The Court finds that this analysis is misplaced; the relevant inquiry as it relates to Count II of the Complaint is whether Rabbitt did or did not consider the personnel factors when he chose to terminate Rodriguez. Rodriguez has presented no evidence to show that any such consideration impacted his decision to end Rodriguez' employment.

Rodriguez' reliance on Metz is also misplaced because that case involved a challenge of a Merit System Protection Board decision. At

13

the time of his termination, Rodriguez was a probationary employee and had not yet completed one year of continuous service. Therefore, he was not eligible for protection from adverse actions as adjudicated and enforced by the Merit System Protection Board. Perhaps most importantly, Rodriguez was terminated at NIST and neither attempted nor was ever able to challenge his termination before the Merit System Protection Board.

The law is clear that it is not the province of federal courts to interfere in an agency's legitimate personnel decision. EEOC v. Clay Printing Co., 955 F.2d 936, 946 (4th Cir. 1992) (it is not the purpose of the EEOC nor the function of the Court to second guess the wisdom of business decisions); Lovelace v. Sherwin-Williams Co., 681 F.2d 230, 245 (4th Cir. 1982) (Title VII was not created to allow the Court to "second guess" the wisdom of an employer's judgment).

Finally, Rodriguez asserts that NIST's decision to terminate him was pretextual on the theory that the agency's disciplinary process acted as the conduit of Lynch's prejudice. The Court regards this contention as nothing more than a far-flung "catch all" argument with no substance whatsoever. The record shows that Rabbitt appointed Aycock to conduct an investigation of the remarks made by Rodriguez and later consulted with various personnel regarding the appropriate action to take. It is also clear that Rodriguez himself refused to sign an affidavit denying he made the alleged threats. Rabbitt's decision to terminate Rodriguez on March 7, 1994 was made with the concurrence of the personnel office and the Deputy Director of Administration, Karl Bell. Nothing in the body of undisputed evidence even remotely suggests that Lynch "used" the Agency's disciplinary processes as the "conduit for her prejudices."

The district court concluded correctly that Rodriguez failed to "demonstrate that [he] was not terminated because of Rabbitt's good faith belief that Mr. Rodriguez did engage in misconduct serious enough to warrant dismissal." The district court also noted correctly that Rodriguez did not produce any evidence to show that Rabbitt terminated Rodriguez because of his national origin. In short, the district court did not err in concluding that there was nothing in the record to support a finding that Rabbitt's decision to terminate Rodriguez

14

was pretextual. For these reasons, we affirm the district court as to Count II.

Count Three

In Count Three Rodriguez alleged that his termination was in retaliation for his complaints of national origin discrimination. Under controlling case law, Rodriguez can prove a prima facie case of retaliation by showing that (1) he engaged in protected activity; (2) the employer took adverse action against him; and (3) a causal connection existed between the protected activity and the adverse action. Carter v. Ball, 33 F.3d 450, 460 (4th Cir. 1994); Williams v. Cerebronics, Inc., 871 F.2d 452, 457 (4th Cir. 1989). Even if Rodriguez established a prima facie case, he still retains the burden to show that the agency's reason for terminating him was merely pretextual and that the agency intentionally discriminated against him on the basis of his national origin. See St. Mary's Honor Center v. Hicks, 509 U.S. 502, 507-08 (1993); Holder v. City of Raleigh, 867 F.2d 823, 828 (4th Cir. 1989).

The record establishes that Rodriguez neither sought EEO counseling nor filed a written EEO complaint until after his termination. Thus, Rodriguez is left to argue that he was terminated in retaliation for complaining to Rabbitt about Lynch on February 17, 1994 and for writing a memo to Rabbitt on February 23, 1994 in complaint of Lynch. The evidence shows, however that neither the meeting nor the memo contained any reference at all to national origin discrimination. Rather, there were allegations of mistreatment, intimidation, and manipulation by Lynch against all of the employees is the Facilities Services Group. These communications directly contradict Rodriguez' present assertion that he was singled out by Lynch based on his national origin.

Finally the Court finds no causal connection between the protected activity Rodriguez engaged in and the adverse action taken against him. It is well established that "mere knowledge on the part of an employer that an employee . . . has filed a discrimination charge is not sufficient evidence of retaliation to counter substantial evidence of legitimate reasons" for an adverse employment action. Williams, 871 F.2d at 455.

15

In sum, the record before this Court directly contradicts appellant's assertions that the Secretary's nondiscriminatory reason for terminating Rodriguez was pretextual. The Court therefore AFFIRMS the district court's granting of summary judgment as to Count Three.

Conclusion

For the reasons provided above, this Court affirms the district court's granting of summary judgment as to all Counts of the Complaint.

AFFIRMED

16