**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LLOYD M. COOPER,
Plaintiff-Appellee,

v.                                             No. 97-1543

PAYCHEX, INCORPORATED,
Defendant-Appellant.

LLOYD M. COOPER,
Plaintiff-Appellee,

v.                                             No. 97-1645

PAYCHEX, INCORPORATED,
Defendant-Appellant.

LLOYD M. COOPER,
Plaintiff-Appellant,

v.                                             No. 97-1720

PAYCHEX, INCORPORATED,
Defendant-Appellee.

Appeals from the United States District Court
for the Eastern District of Virginia, at Alexandria.
James C. Cacheris, Senior District Judge.
(CA-96-54-A)

Argued: December 1, 1997

Decided: August 31, 1998

Before WILKINS, NIEMEYER, and MICHAEL, Circuit Judges.

Affirmed by unpublished opinion. Judge Michael wrote the majority opinion, in which Judge Wilkins joined. Judge Niemeyer wrote a dissenting opinion.

_____

## COUNSEL

**ARGUED:** Harry L. Manion, III, COOLEY, MANION, MOORE & JONES, L.L.P., Boston, Massachusetts, for Appellant. Christine Elizabeth Webber, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, Washington, D.C., for Appellee. **ON BRIEF:** Timothy D. Speedy, Gregory T. Alvarez, JACKSON, LEWIS, SCHNITZLER & KRUPMAN, Morristown, New Jersey, for Appellant. Joseph M. Sellers, Dann Determan, WASHINGTON LAWYERS' COMMITTEE FOR CIVIL RIGHTS AND URBAN AFFAIRS, Washington, D.C.; William D. Hopkins, Jodi L. Cleesattle, ROSS, DIXON & MASBACK, L.L.P., Washington, D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

## OPINION

MICHAEL, Circuit Judge:

Lloyd Cooper sued his former employer, Paychex, Inc., alleging violations of Title VII and 42 U.S.C. § 1981. At trial Cooper's supervisor said that Cooper was fired due to poor job performance, and Cooper offered evidence that the supervisor's claim was merely pretext for racial discrimination. The jury believed Cooper and gave him a substantial verdict, including punitive damages. After trial the district court denied Paychex's motion for judgment as a matter of law or for a new trial and awarded Cooper attorneys' fees. On appeal Paychex argues that its post-trial motions should have been granted because the court erred by: admitting evidence concerning the racial

2

bias of Cooper's former secretary; admitting data on the racial makeup of Paychex's nationwide employment figures; refusing to give the jury a "business judgment" instruction; and misstating the burden of proof in a race discrimination case. Paychex also contends that the court's grant of attorneys' fees was excessive and that the jury should not have been instructed on punitive damages. In addition, Cooper cross-appeals the amount of fees he was granted. We find no error in the trial court's jury instructions or evidentiary decisions or in the amount of its attorneys' fees award. Therefore, we affirm.

I.

Cooper, an African American sales manager, worked for Paychex, a national payroll servicing company, from 1989 until his termination in 1993. Cooper initially was hired as the Field Sales Manager (FSM) for Paychex's Washington district, which included offices in Fairfax, Richmond, and Tidewater, Virginia. In 1990 Cooper became the District Sales Manager (DSM) for the Washington district. As DSM, Cooper was responsible for recruiting, training and supervising sales representatives. The district's FSM, Jane Hartsock, assisted him with these tasks.

Cooper was an excellent DSM. He was readily available to help sales representatives with technical or sales-related questions, and he had a good working knowledge of both of these aspects of Paychex's business. Cooper also brought a great deal of intensity and commitment to his job. In fact, certain Paychex sales representatives said that Cooper was the best DSM they had worked under during their careers at Paychex. Cooper was therefore a strong leader for the sales team, and he performed well in the area that mattered most to Paychex, meeting sales quotas. Under Cooper's guidance the Washington district achieved 110 percent of its sales quota for the 1993 fiscal year, a 22 percent increase over the prior year. The district continued its success throughout the time Cooper was DSM. In July 1993, for example, the district made 103 percent of its sales quota.

In early 1993 Ed Reid became the Zone Sales Manager (ZSM) of Paychex's Mid-Atlantic Zone, which included the Washington district. As ZSM, Reid supervised every DSM in the Mid-Atlantic Zone, including Cooper. On March 8, 1993, Reid made his first visit as

3

ZSM to the Washington district headquarters in Fairfax. Reid said that one purpose of this visit was to familiarize himself with the district's management and sales personnel. However, Reid did not get around to meeting with DSM Cooper, the leader of the Washington sales team, until after he (Reid) met with other, selected employees in that office, including Cooper's secretary, Tracy Dodd.

Meeting with Dodd was the main reason Reid visited the Washington district. Dodd had complained to Paychex's higher management about Cooper's performance, and Reid wanted to investigate her complaints.[1] When Reid spoke with Dodd, she criticized Cooper's availability, his timeliness, his intensity and commitment to Paychex, and his technical knowledge of Paychex's product. [2] There was, however, ample evidence to allow the jury to conclude that most of Dodd's criticisms of Cooper were baseless. In any event, Reid confronted Cooper that same day. Reid did this without taking time to evaluate Cooper's performance first hand and without consulting nine of the eleven sales representatives in the district about Cooper's performance. When Reid confronted Cooper, he criticized Cooper for, among other things, lacking intensity. In this, Reid's first meeting with Cooper, Reid did not even ask Cooper to assess his own performance, nor did he give Cooper an opportunity to explain the problems alleged about his performance.

About a week later Reid sent Cooper a memorandum, dated March 15, 1993, in which Reid purported to memorialize his comments from

_____

[1] There was evidence that Dodd was prejudiced against African Americans. Dodd admitted at trial that she told racially biased jokes that targeted African Americans and used the term "nigger" to refer to African Americans. In addition, another former Paychex sales representative testified that Dodd had called Cooper a "lazy black ass" behind Cooper's back.

[2] At trial Reid testified that two other Paychex employees with whom he spoke on March 8 also had complaints about Cooper. But Reid admitted that two other employees, including FSM Hartsock (the only other sales manager in the office), had no complaints whatsoever about Cooper on March 8. Further, Reid admitted that his consultation with sales representatives about Cooper's performance was very limited: most of them were not contacted at all.

4

their March 8 meeting. Yet, the memorandum contained some criticisms that Reid had not even discussed with Cooper in the March 8 meeting. These new criticisms included the ones Dodd made to Reid on March 8 -- unavailability, tardiness, and poor technical knowledge. The memo did not offer Reid's basis for these criticisms, however. Also, the memo did not indicate that Reid had performed any further investigation of Cooper's performance after his March 8 visit to the Washington district office.

Cooper attempted immediately to address the criticisms raised in Reid's March 15 memo, both orally and in writing. However, Reid continued to criticize Cooper harshly. About one month after Reid first met with Cooper, Reid warned Cooper in no uncertain terms that "any further infraction" would lead to his termination. This warning, given in a memo dated April 13, did not say what"infraction" Cooper had committed; the memo simply criticized Cooper's handling of a personal dispute between two of the sales representatives. Then, just two weeks later, Reid urged Cooper to resign and accept a severance package. These actions belied Reid's real hostility to Cooper's continued employment with Paychex.

It was revealed at trial that Reid had admitted in his deposition that he decided to fire Cooper within his first month as Mid-Atlantic ZSM. Reid also admitted that he made this decision without first initiating the customary, formal evaluation of Cooper's performance, which would have taken at least ninety days to complete. At trial, however, Reid told a different story and claimed that he did not decide to terminate Cooper until August 1993.

In mid-July 1993 Reid met with Cooper again to address the concerns he claimed to have about Cooper's performance and to discuss the sales figures for the Richmond and Tidewater offices. Again, Reid documented his recollection of this meeting with a memorandum, dated July 20. In that memo Reid directed Cooper to submit an updated action plan for the Richmond and Tidewater offices by the end of July. According to Reid, Cooper failed to comply with this request and gave no adequate excuse for his failure. Afterwards, Reid said, he decided that Cooper was unable to lead the Washington sales team. Reid fired Cooper on August 6, 1993.

5

Reid claimed that he fired Cooper due to poor performance. However, the record amply supports (and the jury believed) a different story, which is: Reid drummed Cooper out of Paychex because he (Reid) wanted to bring in "his own team" -- a team that was all white. Thus, instead of conducting an objective evaluation of Cooper's performance over the customary three-month period, Reid set out immediately to get rid of him. All of Reid's oral and written criticisms of Cooper after March were part of Reid's efforts to cover up his plan to drive Cooper out of the Washington district office and falsify a paper trail to make it look as though Cooper was performing poorly. Reid's strategy was apparent from the way he criticized Cooper's management style from day one, the way he reacted in an unreasonably harsh manner to Cooper's alleged mistakes, and the way he refused to take the time to formally evaluate Cooper's work.

There is other evidence that Reid concocted a scheme to get rid of Cooper and then lied about it. This includes Reid's fabrication of one of the criticisms on which he supposedly relied in terminating Cooper. Reid asserted in his July 20 memorandum to Cooper that sales representative Mike Kelly had complained about Cooper's management. According to Reid, Kelly said that Cooper had left him in the dark about his sales quota and had failed to properly train him. However, Kelly denied ever making the statements and said that any such statements would be false.

Reid told Cooper in mid-April 1993 that he (Reid) wanted to bring in his own team. However, Reid's reason for wanting to bring in his own team was not business-related, but discriminatory: he wanted to get rid of Cooper because Cooper was African American. This discriminatory animus was evidenced by Reid's statement to Cooper, less than two months after becoming ZSM, that " you people don't have the technical expertise to do this job." (emphasis added). Although Reid claimed otherwise, it was clear from the context of the conversation that in referring to "you people," Reid meant African Americans in general. Thus, when Reid said that he wished to bring in his own team, it was clear that Reid did not want any African Americans on that team. And in fact, when Reid brought in his own team, it was all white. After Cooper was fired, Reid promoted Hartsock and Dekowski, both of whom were white, to be the new DSM and FSM, respectively.

6

Reid's discriminatory attitude was also manifested by comparing the favoritism he showed Keith Holland, a white DSM who got into difficulties, with the antagonism he showed Cooper, an African American, as a result of problems attributed to Cooper. The main problems that Reid attributed to Cooper were unavailability, lack of intensity, tardiness, and poor technical knowledge. **3** Holland's problems were far worse. He harassed, lied to, intimidated and threatened his sales staff. Yet, despite the seriousness of the problems with Holland's management style, Reid did not attempt to railroad Holland out of Paychex as he (Reid) did Cooper. Instead, Reid investigated the Holland matter carefully and did not decide how to handle the situation until he spoke to every sales representative in Holland's district (unlike in Cooper's case, when Reid threatened Cooper's job soon after hearing complaints from Cooper's secretary). Even then, Holland was offered an opportunity to improve his performance by attending special training programs, a luxury that Cooper was not afforded. Finally, while Reid was instrumental in the decision to retain Holland, he (Reid) terminated Cooper.

Statistical data showing that Paychex employed very few minorities also lent some support to the case that Cooper was fired because of his race. In 1993 Paychex employed one African American DSM and forty white DSMs. In 1994 there were no African American DSMs and fifty-one white DSMs at Paychex. In 1995 there was just one African American DSM and there were fifty-two white DSMs. This ratio of African American DSMs to white DSMs was nearly the same as the ratio of African American sales representatives to white sales representatives. In 1993 there were nine African American and 510 white sales representatives, in 1994 there were eleven African American and 564 white sales representatives, and in 1995 there were eight African American and 652 white sales representatives.

After a four-day trial the jury awarded Cooper back pay ($200,272), compensatory damages for emotional distress ($50,000), and punitive damages ($100,000). The court then awarded Cooper attorneys' fees. Paychex moved for judgment as a matter of law and

---

**3** Several Paychex sales representatives testified that these complaints were simply untrue, and the jury apparently believed their testimony rather than Reid's.

for a new trial on a number of grounds. According to the trial court, Paychex "hurl[ed] at least sixteen objections against the judicial wall with the hope that at least one [would] stick." Cooper v. Paychex, Inc., 960 F. Supp. 966, 969 (E.D. Va. 1997). The trial court rejected every one of Paychex's claims. See id. at 969-76. Paychex now appeals on essentially the same grounds, and Cooper cross-appeals.

II.

On appeal Paychex offers twelve assignments of error. Of these, seven warrant discussion. First, Paychex claims that the district court committed reversible error by admitting the testimony concerning Dodd's biased remarks about African Americans. The company says it was also error to admit the statistical data showing that the work-force at Paychex was almost entirely white. Next, Paychex asserts that the district court incorrectly stated the law with respect to Cooper's burden of persuasion on the prima facie case of discrimination and the issue of pretext. Further, Paychex argues that it was entitled to a "business judgment" instruction. Paychex argues that it was entitled to judgment as a matter of law, or at least a new trial, as a result of these five errors because the evidence of discrimination was slim without the inadmissible evidence and the instruction errors compounded the harm from the evidentiary errors. In any event, Paychex says the court should not have instructed the jury on punitive damages. Finally, Paychex claims that the award of attorneys' fees was too high. We reject all of these claims.[4]

_____

[4] Paychex also argues that: (1) the district court erred by admitting the findings and conclusions of the Fairfax County Human Rights Commission, which investigated Cooper's race discrimination complaint against Paychex; (2) the court failed to properly instruct the jury that Cooper was required to mitigate his damages; (3) the jury's award of back pay was improper as a matter of law because Cooper failed to mitigate his damages; (4) the jury's award of compensatory damages to Cooper for emotional distress was against the clear weight of the evidence; and (5) the court incorrectly applied Virginia's statutory prejudgment interest rate in calculating prejudgment interest for Cooper.

These claims are meritless for the reasons set forth by the district court. See Cooper v. Paychex, Inc., 960 F. Supp. 966, 970 (E.D. Va. 1997) (explaining why the court properly exercised its discretion to

8

In his cross-appeal Cooper claims that his attorneys' fee award was too low. We disagree and affirm the fee award.

III.

We review a district court's decisions concerning the admission of evidence for an abuse of discretion. See Benedi v. McNeil-P.P.C., Inc., 66 F.3d 1378, 1383 (4th Cir. 1995). Of course, we review de novo all legal questions necessary to assess the ultimate question of whether the court abused its discretion.

A.

The testimony that Dodd had previously told racist jokes, used the word "nigger," and referred to Cooper as a"lazy black ass" tended to show that she was biased against African Americans. The district court concluded that this evidence was admissible because Dodd "had a significant impact in the decision to fire" Cooper. Cooper v. Paychex, Inc., 960 F. Supp. 966, 970 (E.D. Va. 1977). Paychex argues that Dodd's testimony was inadmissible because Dodd was not involved in the decision to fire Cooper. Dodd's testimony was prejudicial, Paychex says, because there is a danger that the jury imputed her bias to the company. We do not believe that a new trial is required because of the admission of Dodd's testimony. Even if the district court abused its discretion in admitting Dodd's testimony, there was still no reversible error because Paychex was not prejudiced by Dodd's testimony.

First, Cooper's trial counsel did not ask the jury to attribute Dodd's comments to Paychex. In his closing Cooper's counsel only referred to Dodd's comments twice. The first time, he said:

_____

admit the Human Rights Commission's report); id. at 972 (explaining why the court's mitigation instruction was proper); id. at 973 (holding that Cooper's mitigation efforts were not insufficient as a matter of law); id. at 973 n.4 (explaining that Paychex waived its objection to the compensatory damages, and further, holding that the award was supported by the evidence); id. at 974 (exercising its discretion to apply the Virginia statutory rate for prejudgment interest in the absence of a standard federal rate).

9

Now, there were two other witnesses who testified about Lloyd's performance at Paychex: One was Tracy Dodd, his secretary, who admittedly did not like him, spied on him, made anonymous calls to headquarters about him, has told racial jokes, has used the word "nigger" and who . . . has called Lloyd "a lazy black ass". It's hard to imagine a case with a more obviously biased and prejudiced witness than that. And Tracy Dodd has a very strong motive to lie about Lloyd in order to justify the firing that her smear campaign brought about.

Here, counsel was arguing that Dodd told a false story about Cooper's performance, which Reid used to begin his campaign to terminate Cooper. Counsel's comments therefore supported the legitimate argument that the company's stated reason for firing Cooper, poor performance, was not worthy of belief.

The second time Cooper's counsel mentioned Dodd's racial bias, he referred in passing to her role in the process of Cooper's termination. However, counsel did not attempt to attribute Dodd's bias to Paychex. Counsel merely said:

Are there any other indications in the record that this was a racially discriminatory firing? Beyond the stark contrast in the treatment of Lloyd and Keith, I suggest the record shows plenty. The firing clearly had its genesis in the anonymous sniping and spying campaign launched by Tracy Dodd, whose racism is virtually admitted.

It was carried out by a zone manager who has had little contact with blacks and no lasting friendship; who has never worked with a black DSM other than Lloyd; who didn't know whether there were any blacks in his community when was growing up; who has never had an opinion about the racial diversity in Paychex's management; who looked Lloyd Cooper in the eye and said, you people don't have the technical knowledge and expertise to do this job, so I will bring in my own team.

10

Ed Reid was granted by Paychex the authority to carry out this firing, and, according to his testimony, the company supported his decision.

So, if his motive was racist, Paychex is liable.

Here, Cooper's counsel mentioned Dodd only briefly, and the focus of his argument was to portray <u>Reid</u>, not Dodd, as a biased decision-maker. Although counsel called Dodd "the genesis" of Cooper's firing, counsel firmly stated that Reid had "carried. . . out" Cooper's firing. Here, counsel was asking the jury to attribute only Reid's racist motives to Paychex. Dodd's alleged racism, while mentioned, was not offered to the jury as a reason to hold Paychex liable for Cooper's termination.

Second, our review of the district court's instruction on liability reveals that the jury was not told that it could attribute Dodd's racial bias to Paychex. The court instructed the jury, correctly, that it could only "consider discriminatory or racially stereotyped comments made, or tolerated by those who participated in employment decisions affecting the plaintiff as evidence of Paychex's discriminatory intent." Here there was no evidence that Reid either knew of or tolerated Dodd's racist comments. Further, Cooper's counsel never argued that Dodd participated in the decision to fire Cooper. We therefore can presume that the jury followed this instruction and did not attribute Dodd's racial biases to Paychex.

Finally, there was enough independent evidence of Reid's own racial bias to support the verdict against Paychex. For example, Reid's "<u>you people</u> don't have the technical expertise" comment to Cooper demonstrated Reid's bias against African Americans. (Emphasis added.) Reid's bias was also shown by his favorable treatment of a white DSM with poor management skills as compared to his harsh treatment of Cooper, who demonstrated that he was an excellent manager.

Accordingly, even if the district court's admission of the evidence of Dodd's bias was improper, we do not believe that it affected the outcome of the case.

11

B.

Paychex also complains that the trial court abused its discretion by admitting statistical data showing the racial composition of Paychex's nationwide sales force. The statistics showed that between 1993 and 1995, the ratio of white to African American sales managers was about one to forty, and the ratio of white to African American sales representatives was about one to fifty. Cooper introduced this statistical data as evidence that Reid's proffered reason for terminating him was merely pretext for discrimination, on the theory that Paychex's poor track record of hiring African Americans was some evidence that his firing had occurred because of his race.

It is well established that "[s]tatistics can provide important proof of employment discrimination" in Title VII cases, both to establish a prima facie case of discrimination and to demonstrate that the employer's proffered reason for its employment decision was pretext for discrimination. See Carter v. Ball, 33 F.3d 450, 456 (4th Cir. 1994). Paychex, however, contends that Cooper's statistics concerning its employment of African Americans nationwide were irrelevant for two reasons. First, Paychex claims that the statistics did not suggest that Reid fired Cooper with a discriminatory motive because nationwide numbers do not reflect Reid's own employment practices (since Reid only managed the Mid-Atlantic zone). This claim confuses the decisionmaker with the employer. See Cooper v. Paychex, 960 F. Supp. 966, 970 (E.D. Va. 1997). Reid was the decisionmaker here, but he made the decision to fire Cooper on behalf of the employer, Paychex. It is the employer, not the decisionmaker, whom a plaintiff sues for violating Title VII. Any statistical evidence which tends to suggest that the employer's practices are discriminatory reflects on the question of whether the employer discriminated against a specific employee, regardless of whether those statistics reflect the practices of the specific person who made the decision to terminate that employee. Moreover, we reject Paychex's premise. Evidence suggesting than an employer had a general practice of discrimination does reflect on the actual decisionmaker because it suggests that the decisionmaker may have followed the company line in making his decision based on race. See Estes v. Dick Smith Ford, Inc., 856 F.2d 1097, 1103 (8th Cir. 1988).

12

Second, Paychex argues that Cooper's data was irrelevant because it did not set forth the racial distribution of the relevant labor pool. Without establishing the number of qualified white and African American candidates for DSM and sales representative positions, Paychex argues, Cooper's evidence of the ratio of whites to African Americans in those positions at Paychex was entirely meaningless to show a pattern of discrimination. We disagree. This circuit has held, on more than one occasion, that a district court did not abuse its discretion by refusing to admit raw employment figures without comparative data on the number of qualified whites and African Americans in the relevant labor pool. See, e.g., Carter, 33 F.3d 450 at 456; Williams v. Cerberonics, Inc., 871 F.2d 452, 455 n.1 (4th Cir. 1989). However, we have never held that data concerning the racial makeup of an employer's workforce was irrelevant to the issue of discriminatory intent in the absence of comparative data on the racial makeup of the relevant labor pool. Of course, raw data, such as the number of African Americans working for a particular employer, will be of little use to a jury if it is not placed in context. See Williams, 871 F.2d at 455 n.1. But we have not set the bar so high that statistical data must be compelling in order to be relevant; the threshold inquiry for relevance is not so stringent. Rather, we have allowed trial courts to exercise their discretion to decide whether the data is placed in sufficient context to be of assistance to the jury. Generally, the presence or absence of comparative data (and the quality of the comparative data) will go to the weight, not the competence, of the evidence.

Here, the statistical evidence showed that Paychex had virtually a lily-white sales force and sales management structure, employing (on average) less than one African American DSM nation-wide between 1993 and 1995. Cooper did not provide comparative labor pool numbers to complement his statistics, so his data was not compelling evidence of discrimination. However, we cannot say that his data was irrelevant. Employment statistics are often admissible as some evidence of discrimination even when they are not enough by themselves to get a plaintiff to a jury on that issue. See MacDissi v. Valmont Indus., Inc., 856 F.2d 1054, 1058 (8th Cir. 1988); cf. e.g., Henson v. Liggett Group, Inc., 61 F.3d 270, 276-77 (4th Cir. 1995); Birkbeck v. Marvel Lighting Corp., 30 F.3d 507, 511-12 (4th Cir. 1994); Mallory v. Booth Refrigeration Supply Co., 882 F.2d 908, 912 (4th Cir. 1989).

13

Therefore, the court did not abuse its discretion by admitting Cooper's statistical data.

Moreover, even if we were inclined to say that the trial court erred by admitting Cooper's statistical data, we are certain that this mistake did not prejudice Paychex. There was independent evidence of pretext (including Reid's harsh treatment of Cooper from day one) and discrimination (including Reid's favoritism of Baltimore DSM Keith Holland and Reid's "you people" comment). This evidence was more than sufficient to get Cooper to a jury. As a result, we conclude that the court neither abused its discretion by denying Paychex a new trial nor erred by denying Paychex judgment as a matter of law due to any errors in admitting evidence.

IV.

Next, Paychex challenges three of the district court's jury instructions. We review a district court's formulation of a jury instruction for an abuse of discretion. See United States v. Abbas, 74 F.3d 506, 513 (4th Cir.), cert. denied, 517 U.S. 1229 (1996). In doing so, we consider whether the instruction, when construed as a whole, "properly informed the jury of the controlling legal principles without misleading or confusing the jury to [the defendant]'s prejudice." Hartsell v. Duplex Prods., Inc., 123 F.3d 766, 775 (4th Cir. 1997).

A.

Paychex criticizes two aspects of the trial court's jury instruction on Cooper's burden of proof. Cooper proceeded under the familiar method of proving employment discrimination by circumstantial evidence, set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973). Under McDonnell Douglas, a plaintiff first must establish a "prima facie case" of discrimination. When the plaintiff alleges that he was illegally terminated, his prima facie case consists of evidence that (1) he was a member of a protected class (2) who was qualified for his job and performed his job satisfactorily, (3) was fired, and (4) the position was filled by a similarly qualified applicant after his dismissal. See Karpel v. Inova Health Sys. Servs., 134 F.3d 1222, 1228 (4th Cir. 1998). Once the plaintiff makes out a prima facie case, the burden of production shifts to the employer, which must

14

articulate a legitimate, nondiscriminatory reason for the adverse employment action. If the employer advances such a reason, the plaintiff must rebut the reason by proving that it was simply pretext for intentional discrimination. See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506-11, 515 (1993).

Paychex challenges the district court's instruction on the second element of the prima facie case. Paychex asked the court to instruct the jury that Cooper must prove he "was qualified for his job and performing his job at a level which met his employer's legitimate expectations." The court opted instead to instruct the jury that Cooper had to prove that he "was satisfactorily performing his job." Paychex argues that this instruction failed to inform the jury that Cooper had to prove he was performing his job to Paychex's satisfaction, not just to the jury's own satisfaction. We disagree.

Paychex is correct, of course, that this court has described the plaintiff's burden using Paychex's proposed language. See, e.g., O'Connor v. Consolidated Coin Caterers Corp., 56 F.3d 542, 546 (4th Cir. 1995), rev'd on other grounds, 517 U.S. 308 (1996); Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1315 (4th Cir. 1993). Further, we agree that Paychex's proposed language more clearly conveys to a jury that it may not impose on a defendant its own view of what constitutes satisfactory employee performance. However, when evaluating jury instructions we do not reverse simply because one instruction might have been a little clearer. See Nelson v. Green Ford, Inc., 788 F.2d 205, 209 (4th Cir. 1986). Rather, we affirm so long as the jury instructions, taken as a whole, were correct and understandable. Here, the district court's formulation of Cooper's burden was correct and understandable, since we have often used similar formulations without any indication that a district court must be more clear. See, e.g., Carter v. Ball, 33 F.3d 450, 459 (4th Cir. 1994); McNairn v. Sullivan, 929 F.2d 974, 979 (4th Cir. 1991); Alvarado v. Board of Trustees, 928 F.2d 118, 122 (4th Cir. 1991); Williams v. Cerberonics, Inc., 871 F.2d 452, 455 (4th Cir. 1989). Since the instruction informed the jury of the law to apply and the instruction's phrasing was understandable, there was no abuse of discretion.

Paychex also complains that the district court did not properly instruct the jury on Cooper's burden with respect to proving pretext. The challenged instruction (with emphasis added) was:

15

> If . . . the defendant has produced evidence of a reason other than race for discharging plaintiff, you must find for the defendant unless you find, considering all of the evidence in the case, that the plaintiff has proved that the reason given by the defendant was not the true reason for plaintiff's discharge, <u>or</u> that it is more likely than not that, except for the plaintiff's race, he would not have been discharged.
>
> Plaintiff must show that the defendant intentionally discriminated against him. Plaintiff, however, is not required to produce direct evidence of intentional discrimination. . . .
>
> . . . .
>
> The law is violated if the defendant's actions would not have occurred "but for" the plaintiff's race.

According to Paychex, this instruction allowed the jury to find that Paychex violated the law if it found <u>either</u> that Paychex's proffered nondiscriminatory reason for terminating Cooper was pretext <u>or</u> that Paychex discharged Cooper because of his race. Paychex argues that this is an incorrect statement of the law. In order to hold an employer liable for intentional discrimination, it argues, a jury must find that the employer's proffered nondiscriminatory reason for firing the employee was pretext for discrimination -- that is, the jury must find <u>both</u> pretext <u>and</u> discrimination.

We agree with Paychex's statement of the law but disagree with its interpretation of the relevant jury instruction. Under the <u>McDonnell-Douglas</u> burden-shifting analysis, an employee retains the ultimate burden of proving that the employer intentionally discriminated against him. <u>See Hicks</u>, 509 U.S. at 514-15; <u>DeJarnette v. Corning Inc.</u>, 133 F.3d 293, 298 (4th Cir. 1998). Thus, although the <u>McDonnell-Douglas</u> analysis helps focus the jury's inquiry by placing before it two possible reasons for the employer's adverse employment action, the intent to discriminate and the employer's proffered, legitimate reason, the jury is not required to accept the former just because it rejects the latter. The jury may disbelieve that the employer's proffered reason was its actual reason for firing the plaintiff, but remain

16

unconvinced that the real reason the employer fired the plaintiff was due to unlawful discrimination.[5] Since a plaintiff does not prove his case unless the jury both rejects the defendant's proffered reason for the adverse employment action and accepts that the real reason for the employer's action was discrimination, a court may not inform a jury to decide for the plaintiff if it finds solely pretext. A court must inform a jury to find for the plaintiff only if it finds both pretext and discrimination.

If the district court had done as Paychex claims, it would have been in error. However, the court's jury instruction focused on the defendant, not on the plaintiff. The court did not state at any time that the jury could give the plaintiff a verdict if it found pretext but not discrimination. Rather, the court said the converse, that the jury "must find for the defendant unless" it found pretext or discrimination. Of course, if the court had just left it at that, the instruction would have been incomplete. Since this part of the instruction did not tell the jury what to do if it found just pretext, the jury might have been left with the mistaken impression that it could give a verdict to the plaintiff based solely on a finding of pretext. However, the court's instruction did not stop there. The court also explained to the jury that if it found pretext it had to ascertain whether "[p]laintiff . . . show[ed] that the defendant intentionally discriminated against him." This instruction adequately informed the jury that it had to find both pretext and discrimination in order to find for Cooper.

As if this was not enough, the court also made certain that the jury understood the law by reiterating the bottom line:"the law is violated if the defendant's actions would not have occurred`but for' the plaintiff's race." This additional instruction informed the jury that, despite the burden-shifting aspect of the prima facie case, Cooper retained the ultimate burden of proving that Paychex's proffered reason for firing

_____

[5] That is to say, the jury may conclude that the defendant fired the plaintiff for a third (legitimate but not proffered) reason. The jury could so conclude if it found that the employer proffered a false reason for its action, not as a pretext for discrimination but rather to cover up a third (possibly embarrassing but nonetheless legitimate) reason for firing the plaintiff. Cf. e.g., Holder v. City of Raleigh, 867 F.2d 823, 827-28 (4th Cir. 1989).

17

him was pretext for discrimination. On the whole, the district court's instruction on pretext was correct. Again, there was no abuse of discretion.

B.

Paychex also challenges the district court's decision not to give a "business judgment" instruction, that is, an instruction to the jury that it could not find for Cooper simply because it disagreed with Reid's reason for firing him. Paychex argues that such an instruction was necessary to ensure that the jury did not substitute its own ideas about fairness and good business practices for Reid's. We disagree.

When scrutinizing the district court's jury instructions in a race discrimination case, we consider whether the instructions "fairly placed before the jury the dispositive question of whether race was a determinative factor in the adverse employment decision." Fuller v. Phipps, 67 F.3d 1137, 1144 (4th Cir. 1995). If so, we require no further explication of the law. In fact, we discourage repetitive or complex supplemental instructions that may confuse the jury. Cf. Mullen v. Princess Anne Volunteer Fire Co., Inc., 853 F.2d 1130, 1137 (4th Cir. 1988). It is true, of course, that a jury may not substitute its own business judgment for that of the employer. See McNairn, 929 F.2d at 980; cf. also Holder v. City of Raleigh, 867 F.2d 823, 825-26 (4th Cir. 1989). However, we do not require a trial court to provide a separate business judgment instruction when it otherwise correctly instructs the jury on the law. Even when a business judgment instruction might be useful, its omission does not provide a basis for undermining the adequacy of the jury charge as a whole so long as the rest of the charge does do not lead the jury to believe that it may find for the plaintiff if it disagrees with the employer's business judgment. See Kelley v. Airborne Freight Corp., 140 F.3d 335, 350-51 (1st Cir. 1998).

Here (as we explained above), the district court properly instructed the jury on the prima facie case and the issue of pretext. The court then reiterated that the jury could give a verdict to Cooper only if Paychex terminated him because of his race. These instructions did not suggest that the jury could find for Cooper simply because it disagreed with Reid's decision to fire Cooper. Rather, these instructions

18

made clear that Cooper could prevail only if he showed that Paychex's proffered reason for his termination was false and the real reason he was fired was his race. The instructions correctly stated the law, and the court was required to do no more than that.**6**

C.

Paychex also complains that the district court should not have instructed the jury on punitive damages. Paychex argues that even if Cooper proved that it fired him because of his race, there was no evidence that Paychex acted with the heightened culpability necessary for an award of punitive damages.

Punitive damages are not warranted in every case of discrimination. See Stephens v. South Atl. Canners, Inc. , 848 F.2d 484, 489-90

_____

**6** Paychex urges us to adopt a rule requiring a business judgment instruction whenever the defendant asks for one, even when the district court has correctly instructed the jury that it must find that the plaintiff's race was the "but for" cause of his termination. Only one circuit follows such a rule, see Stemmons v. Missouri Dep't of Corrections, 82 F.3d 817, 819 (8th Cir. 1996); Walker v. AT&T Techs., 995 F.2d 846, 849-50 (8th cir. 1993), and even that circuit has held that the failure to give such an instruction is not necessarily prejudicial error, see Stemmons, 82 F.3d at 820.

We need not decide now whether such a rule is warranted. Even if we required such an instruction, the failure to give one here was not prejudicial error. Nothing in the record suggested to the jury that it could find for Cooper merely because it disagreed with Reid's business judgment. Although Cooper challenged Reid's assessment of his performance, Cooper's lawyer used this testimony in his summation solely to show that Paychex's proffered reason for firing Cooper was pretextual. Also, there was substantial evidence and argument about the issue of race. Surely, the jury knew that the issue before it was race, not fairness, so there was no need for a business judgment instruction. See Stemmons, 82 F.3d at 820-21 (holding that the failure to give a business judgment instruction was not reversible error, and distinguishing Walker, which held that failure to give a business judgment was reversible error, because in Walker the trial focused solely on the plaintiff's qualifications and there was no testimony about whether discrimination played a role in the adverse employment decision).

19

(4th Cir. 1988). Evidence sufficient to reach a jury on the issue of discrimination is not necessarily sufficient to warrant a punitive damages instruction. See Harris v. L & L Wings, Inc., 132 F.3d 978, 982-83 (4th Cir. 1997). To warrant such an instruction, under both Title VII and 42 U.S.C. § 1981, the plaintiff must offer evidence which tends to show that defendant acted with "malice, an evil motive, or recklessness or callous indifference to a federally protected right." Cline v. Wal-Mart Stores, Inc., 144 F.3d 294, 306 (4th Cir. 1998) (quoting Stephens, 848 F.2d at 489).

Paychex argues that Cooper's sole proof of Reid's racial animus was Reid's "you people" remark, which (it contends) was insufficient to prove that Reid acted with malice towards Cooper's right to be free from race discrimination. Paychex further contends that this remark was not known to Paychex, and so Paychex cannot be held liable for it. Here Paychex is wrong as a matter of law and as a matter of fact. First, it is "well settled that a private employer may be held liable for punitive damages in employment discrimination case .. . based on the act of supervisory employees." Patterson v. P.H.P. Healthcare Corp., 90 F.3d 927, 942 (5th Cir. 1996), cert. denied , 117 S. Ct. 767 (1997). As ZSM, Reid was without question a very high-level supervisor. He was exactly the type of corporate "higher management" whose malice or reckless indifference will be attributed directly to the corporate employer through agency theory and will result in the imposition of punitive damages against his employer. See Reynolds v. CSX Transp., Inc., 115 F.3d 860, 869 (11th Cir. 1997), cert. denied, 118 S. Ct. 2364 (1998); see, e.g., Patterson, 90 F.3d at 942; Cline, 144 F.3d at 299, 306. If Reid acted with malice or reckless indifference, then Paychex was liable for punitive damages.

Second, Paychex is wrong that Cooper's only evidence of Reid's malice or reckless indifference was Reid's "you people" statement. Punitive damages may be warranted in discrimination cases when the employer (or its agent) deliberately deceives the court by consciously misrepresenting its true motives for an employment decision. See Merriweather v. Family Dollar Stores of Indiana, Inc., 103 F.3d 576, 582 (7th Cir. 1996); see, e.g., Cline , 144 F.3d at 306. Here the jury necessarily found that Reid lied when he testified about his reason for firing Cooper. Indeed, the jury must have found that Reid deliberately lied about his reason for firing Cooper throughout this episode --

20

from March 8, 1993, when he (Reid) first met with Cooper and criticized him for no apparent reason; through mid-March 1993, when he began creating a paper trail to cover his true intent to fire Cooper; through July 1993, when he attributed false criticisms of Cooper to Mike Kelly; and through early 1997, when he testified at trial. Reid's systematic and continuous deceit, including his orchestrated cover-up of his racist motivations and the jury's obvious rejection of his testimony as false, revealed Reid's truly cavalier disregard for Cooper's federal right to be free from race discrimination. Therefore, the district court did not abuse its discretion in instructing the jury on punitive damages.

V.

Finally, Paychex argues that Cooper's request for attorneys' fees was excessive and, therefore, should be denied or substantially reduced. We disagree. As the prevailing party in this civil rights action, Cooper was entitled to an award of attorneys' fees. See Rum Creek Coal Sales, Inc. v. Caperton, 31 F.3d 169, 174 (4th Cir. 1994); 42 U.S.C. § 2000e-5(k). The district court had the discretion to determine the amount of the fee award, based on the twelve factors set forth in Johnson v. Georgia Highway Express, Inc., 488 F.2d 714, 717-19 (5th Cir. 1974). See Barber v. Kimbrell's Inc., 577 F.2d 216, 226 (4th Cir. 1978). Cooper requested attorneys' fees and costs in excess of $397,000 for the seven lawyers, one summer associate and five paralegals who assisted in his representation. The trial court carefully considered this request in a detailed, 15-page opinion by applying the factors set forth in Johnson. See Cooper v. Paychex, No. 96-54-A, mem. op. at 2-14 (E.D. Va. April 14, 1997). The court awarded Cooper $311,117.50 plus costs. The court concluded that this award was warranted because Paychex's attorneys "played hard ball" throughout the litigation, id. at 6, and because Cooper's attorneys received "excellent results in getting [him] awarded back pay, compensatory damages and punitive damages," id. at 12. Further, the court did not simply award Cooper's full request. The court reduced the fee amount for over-staffing or inefficient use of time. See id. at 3-8. Overall, the court reduced Cooper's fee request by more than 20 percent, and we cannot say it abused its discretion by not reducing the award any more than that.

21

Nor can we say that the district court abused its discretion by trimming too much fat from Cooper's fee award. Cooper challenges two specific cuts: (1) the court's reduction, from $360.00 to $280.00, of the hourly fee for his lead counsel (who had 27 years' experience as a litigator), and (2) the court's refusal to award fees for 76 percent of the time his lawyers spent responding to Paychex's motion for summary judgment. The court reduced lead counsel's rate because other, similarly experienced attorneys winning recent civil rights cases in that court had received only $225.00 to $250.00 per hour. See id. at 10-11. And, the court awarded fees on only 59.9 hours for Cooper's summary judgment response because it found Cooper's 244.8-hour request to be "extremely excessive." See id. at 8.

Cooper argues that the court should have granted his lead counsel at least $325.00 per hour, which Cooper claims is the accepted rate in the Washington, D.C. metro area. For this proposition Cooper cites Laffey v. Northwest Airlines, Inc., 572 F. Supp. 354, 371 (D.D.C. 1983), rev'd in part on other grounds, 746 F.2d 4 (D.C. Cir. 1984), which sets forth a rate schedule that (as updated yearly) has been accepted by the District of Columbia Circuit as"a useful starting point" for determining the prevailing fee rate in Washington, Covington v. District of Columbia, 57 F.3d 1101, 1109 (D.C. Cir. 1995), cert. denied, 516 U.S. 1115 (1996). Of course, a trial court determining what fee to award may take into account a rate schedule like the Laffey court did. But it need not do so. We are skeptical about endorsing a fee schedule, since a district court's discretion is already adequately guided by Johnson.[7] Therefore, we conclude that the trial court did not abuse its discretion by using its own precedents to gauge the going rate for experienced attorneys in civil rights cases.

We also reject Cooper's contention that the district court was wrong to award less than one fourth of the hours his lawyers spent responding to Paychex's summary judgment motion. Although the court slashed this particular line item, on the whole the court granted

_____

[7] In fact, the Laffey rate schedule may be the wrong indicator for attorneys fees in the Eastern District of Virginia. Even if the prevailing rate for senior partners in downtown Washington, D.C. is well above $300.00 per hour, the prevailing rate may be somewhat lower in the suburbs of Washington, like Alexandria, Virginia.

22

Cooper nearly 80 percent of what he requested. Even if the court cut too close to the bone on this one item, we cannot say that the overall fee award was an abuse of discretion.

VI.

As the district court put it, "[t]he outcome of this case turned on the credibility of two witnesses, the plaintiff Lloyd Cooper and Mr. Ed Reid, the man who fired him on behalf of the defendant [Paychex]. The jury obviously believed Cooper more than Reid." Cooper v. Paychex, Inc., 960 F. Supp. 966, 973-74 (E.D. Va. 1997). Credibility was a question for the jury, and we will not second guess its verdict. The district court's denial of Paychex's post-trial motions and grant of fees to Cooper are both

AFFIRMED.

NIEMEYER, Circuit Judge, dissenting:

Contrary to the asserted position of Paychex, Inc., that it terminated Cooper's employment because of poor job performance, Cooper maintains that it was because he was African-American and that his termination violated Title VII of the Civil Rights Act.

At trial, Cooper was permitted to introduce extensive and highly inflammatory, irrelevant testimony of his secretary, Tracy Dodd, who not only did not care for Cooper but also was a racial bigot. The record demonstrates, however, that Dodd was not the decisionmaker, nor was she consulted when the decision to terminate Cooper's employment was made. Indeed, there was no evidence that Edward Reid, the zone manager who made the decision to terminate Cooper, was even aware of Dodd's racial animus. Dodd's limited role involved her complaints to Reid, made after he became zone manager in 1993, that Cooper came to work late and left early and that he did not prepare monthly reports as necessary.

Yet, Tracy Dodd's testimony was the centerpiece of Cooper's case for racial discrimination. Over objection, Dodd was pressed to testify about her racial prejudice, her having told racially biased jokes, and

23

her having referred to African-Americans as "niggers." Over objection, she reluctantly agreed that she had referred to Cooper as "an asshole," and another employee was allowed to attribute to Dodd her characterization of Cooper as a "lazy black ass" as well as other racial references about Cooper. During closing argument to the jury, this evidence was again paraded to the jury by Cooper's counsel when he argued as follows:

> Now, there were two other witnesses who testified about [Cooper's] performance at Paychex: One was Tracy Dodd, his secretary, who admittedly did not like him, spied on him, made anonymous calls to headquarters about him, has told racial jokes, has used the word "nigger" and who, while smoking with John Gillogly, has called [Cooper] "a lazy black ass." It's hard to imagine a case with a more obviously biased and prejudiced witness than that. And Tracy Dodd has a very strong motive to lie about [Cooper] in order to justify the firing that her smear campaign brought about.

The jury surely transferred this animus to the workplace generally and to Paychex in particular.

In reviewing its decision to admit this evidence of and about Tracy Dodd, the district court justified it on the grounds that Dodd "appears to have had a significant impact on the decision to fire. Accordingly, her testimony was properly admitted." That conclusion by the district court, however, has no support from evidence in the record.

When Dodd's evidence is properly excluded from the jury, then the thinnest of evidence, if any, remains to support a finding of racial animus in Reid's decision to fire Cooper. When Reid became zone manager in March 1993, he began to make some personnel changes, and over the next two years he fired Cooper as well as two other district sales managers, both of whom were white, and he recommended that a third district sales manager, also white, be terminated. In no document or testimony is there any evidence that race was a factor in making these decisions. Indeed, the evidence shows to the contrary that during his period as zone manager, Reid hired three black sales representatives.

24

Cooper testified, however, that Reid wanted to put in his own sales team, all of whom were white. In connection with that effort, Cooper attributed to Reid the following statements:

> Mr. Reid said to me that he wanted his own team. Mr. Reid said to me that he didn't think I can bring the team to the next level which has 125 percent quota. Mr. Reid looked me dead in the eye and made a face and said: You people don't have the technical expertise to do this job.

While Cooper took the reference to "you people" to refer to black people, in context it would appear more probably to refer to the team that Reid was replacing with his own personnel.

This remaining bit of testimony, which is ambiguous at most, does not, I respectfully submit, support the jury's aggressive verdict entered in this case, much less its award of punitive damages. The record reveals clearly, in my judgment, that Dodd's testimony was a most prejudicial and unfortunate element in this case, violating Federal Rule of Evidence 403.

Because I conclude that the admission of Dodd's extensive testimony about her prejudice constituted reversible error, I would remand this case for a new trial. Accordingly, I dissent.

25